[No. 15961.  Department Two.  January 24, 1921.]

W. J. JAMMIE, *Respondent,* v. F. B. ROBINSON *et al.,*
*Appellants.*[1]

FRAUD (3)—FRAUDULENT REPRESENTATIONS IN GENERAL—NATURE —ADOPTION OF STATEMENTS.  Where the seller of a moving picture business referred to conditions represented to him by his vendor as to the business at a time when his vendee was present and negotiating for the business, he adopted the representations and made them his own, and must answer therefor if he knew them to be false, since his conduct amounted to a concealment or suppression of the truth.

CONTRACTS (8)—REQUISITES AND VALIDITY—AGREEMENT TO MAKE CONTRACT IN FUTURE.  Where the parties, when they met pursuant to appointment, contemplated a formal and complete contract of sale of a moving picture business, their prior correspondence containing a proposal and acceptance of the terms offered, to be closed shortly, did not constitute a completed contract, as there was no meeting of minds.

FRAUD (22)—EVIDENCE—SUFFICIENCY.  Upon an issue as to fraud in the sale of a moving picture business, there is a question for the jury where the seller represented that the theater was clearing $250 to $300 per month, and he admitted on the stand that it lost about $3.50 per day.

SAME (23)—DAMAGES—MEASURE.  In an action to recover money paid for a moving picture business under false representations, the measure of damages is not the difference between the actual value and the value as represented; but the buyer, having tendered the theater back, may recover the money paid under the contract vitiated by fraud, and this includes a deposit for rent of the premises.

Appeal from a judgment of the superior court for Spokane county, Blake, J., entered December 2, 1919,

[1]Reported in 195 Pac. 6.

upon the verdict of a jury, in an action to rescind a contract for fraud. Affirmed.

*F. M. Goodwin,* for appellants.

*Robertson, Miller & Robertson,* for respondent.

HOLCOMB, J.—The second amended complaint, on which this cause was tried, alleged that defendant F. B. Robinson made certain false and fraudulent representations on which plaintiff relied as to a motion-picture theater in Ellensburg, Washington, known as the Isis Theater, namely; that he, Robinson, had procured the consent of Millie B. Sayles to an assignment and lease of the theater, when, in fact, she had not consented thereto; that the moving-picture business of the theater was netting two hundred and fifty to three hundred dollars per month; that the daily receipts did not run less than from thirty dollars to seventy-five dollars; that defendant knew these statements to be false and untrue. Plaintiff demanded to recover the amount paid on the written contract, to defendant, namely, $846.70, with interest thereon from the date of the contract. The complaint further alleged, in effect, that, on or about June 11, 1917, plaintiff was ejected from the Isis Theater by Millie B. Sayles, the owner thereof.

A second cause of action set up in the second amended complaint demanded damages in the sum of three hundred dollars on account of loss in the operation of the picture show, during the period plaintiff had it, from March 6 to June 10 or 11, 1917. But this cause of action was withdrawn from the jury upon an instruction that plaintiff could not recover thereon.

Defendants, in answer to the second amended complaint, admitted that they received $846.70 from plaintiff on account of the purchase price of the assign-

ment of the lease of the moving-picture business referred to in the complaint, but denied that defendant Robinson made any fraudulent representations in connection with the assignment of the lease and the sale of the moving-picture business to plaintiff, and denied that Millie B. Sayles refused her consent to the assignment of the lease from Robinson to plaintiff; set up, by way of counterclaim and cross-complaint, that plaintiff agreed to pay the sum of $1,396.70 for the assignment of the lease and the purchase of the moving-picture business referred to, setting out the agreement in full; and alleged that he had paid only the sum of $846.70 and that a balance was due of $523.60 on account of the agreed purchase price. They further alleged that plaintiff agreed to pay defendant the rental of the theater for the months of March and April to May 9, 1917, as it became due, defendant having paid the rental in advance, such rental being the sum of $115 per month for each of those months, making a total of $230, no part of which has been paid. They set up a further second cause of action and cross-complaint upon a promissory note executed by Jammie and his wife to Robinson for $120.

For reply to the counterclaim and cross-complaint, plaintiff denied all the allegations contained therein, except the execution of the memorandum agreement referred to by defendants in paragraph one of their counterclaim and cross-complaint. Upon these issues, the cause went to trial before the court and a jury.

Appellants make ten assignments of error, five of which were determined in the submission of the cause to the jury in favor of appellants under the following instruction:

"The plaintiff alleges and claims as a fraudulent representation that the defendant Robinson told him that he would procure the consent of Mrs. Sayles to

the assignment of the lease from him, Robinson, to the plaintiff Jammie. But I charge you that, as a matter of law, this is not a fraudulent representation, because the plaintiff Jammie was not injured by it, even though it was made, inasmuch as he became the possessor and owner of the lease and the moving-picture business when he became the occupant of the premises with the knowledge of Mrs. Sayles.''

There is no need of further discussion of those claims of error arising upon the ruling upon a motion to strike a paragraph of the second amended complaint and permitting respondent to amend a paragraph thereof, overruling appellants' objection to and admitting evidence of an alleged eviction from the theater and refusing to give appellants' requested instructions numbered 5 and 7.

The court gave proper instructions to the jury upon the questions of fraud and deceit and the *quantum* of proof necessary to enable one to recover upon such allegations, and, after a careful examination of the instructions and the requested instructions of appellants that were refused, we can find no error in the instructions given or in rejecting any of the instructions requested, if the case was a proper one to go to the jury at all.

The court gave very clear, concise and correct instructions to the effect that the basis of respondent's action is fraud; that the fraud which gives rise to an action of deceit exists where a person makes a false representation of a material fact susceptible of knowledge, knowing it to be false, or as of his own knowledge, when he does not know whether it is true or false, with intention to induce the person to whom it was made, in reliance upon it, to do or refrain from doing something to his pecuniary hurt, when such person, acting with reasonable prudence, is thereby deceived to so do or refrain from doing, to his damage.

The jury were also told that, in cases of this kind, the proof required to sustain such allegations of deceit or fraud must be clear, cogent and convincing; that fraud is never presumed. They were told that the material allegations of deceit and fraud involved in respondent's complaint were these: (a) That the appellant represented that the moving-picture business was netting him (Robinson) from two hundred and fifty dollars to three hundred dollars per month; (b) that he represented that the daily receipts did not run less than thirty dollars to seventy-five dollars.

The jury were then told that they must be convinced under the rule as to the nature and quantity of proof required: First, that the defendant made one of the representations to plaintiff above enumerated as a fact, as distinguished from the mere expression of an opinion; second, that one or more of such representations were false; third, that the defendant knew it to be false or made it recklessly of his own knowledge when he did not know whether it was false or true; fourth, that such representation was made with the intention of inducing plaintiff to purchase the moving-picture business; fifth, that plaintiff, acting with reasonable prudence, relied upon such representations and was thereby deceived and induced to purchase the moving-picture business, and that, with regard to the element of reliance the representation must have been the cause which directly and proximately induced plaintiff to purchase the picture-show business, that is, the cause without which he would not have purchased; sixth, that plaintiff bought the moving-picture business to his pecuniary damage.

The jury were also told that fraud cannot be based on mere expression of opinion, and that a party who makes an independent examination or investigation as to any property or business is bound thereby and can-

not charge another with fraud as to any fact or matter coming within the scope of such examination or investigation; and that, in such case, the parties are upon equal ground and their own judgment must be their guide in coming to conclusions.

They were instructed, however, that, even though plaintiff may have made an independent investigation of the business of the Isis Theater, this would not deprive him of the right to rely upon representations of fact made to him by the defendant, which may have been difficult to ascertain by investigation, and in relation to which the defendant may have had better means of knowledge than the plaintiff.

The court also instructed that, when one person states to another his opinion as to the value of any property merely as his opinion, not as a fact that he knows to be true, then the person to whom such opinion is stated in this manner has no right to rely upon such opinion, but must exercise his own judgment.

The jury were instructed that, if they found for the plaintiff, to allow him the sum that he paid for the business, to wit, $846.70, with interest at the rate of six per cent per annum from the date of payment until the date of the verdict. They were, however, further instructed that, plaintiff having admitted the execution of a promissory note for $120, they should find for the defendants in that sum with interest at the rate of eight per cent per annum from April 13, 1917, even though they should find for the plaintiff on his cause of action and deduct it from the amount of recovery for the plaintiff. The jury found for the plaintiff and fixed his recovery at the sum of $838.86 and costs.

During the trial, appellants objected to the admission in evidence of alleged verbal representations of appellant F. B. Robinson made in Ellensburg, on or about March 5 or 6, 1917, and thereafter, as to the earnings

and business of the Isis Theater, and demanded an instruction to the effect that the undisputed evidence in the case established the fact that, by correspondence and telegrams passing between respondent and appellant Robinson, prior to the execution of the formal contract of March 5, 1917, respondent had contracted to buy appellant's interest in the Isis Theater and lease therefor at an agreed price and upon terms substantially embodied in the formal contract, and that respondent became thereby obligated to conclude such purchase by making the payments and executing the later contract; and his failure so to have done would have rendered him liable in damages to the appellant; that no misrepresentations alleged by respondent in his complaint could be considered as affecting the validity of the contract of March 5, 1917, which respondent was required by his agreement to make substantially in the form in which it was executed. The court's rulings in admitting the testimony above mentioned and refusing the instruction above quoted present the most difficult questions in this case.

The situation under the facts in this case was somewhat peculiar. Robinson had, in January of the same year, purchased this same theater and its business from one Baumgartner, who had operated it for some time theretofore. At the time he was negotiating for the purchase from Baumgartner, Mrs. Jammie, wife of respondent, and who conducted most of the correspondence between respondent and appellant, was present and knew of the representations made by Baumgartner to Robinson and of the consummation of the negotiations in the purchase by Robinson of the theater business. She had gone there herself in answer to an advertisement that had been published in the Spokane Spokesman-Review for a prospective purchaser by Baumgartner; but when she got there she

found Robinson already negotiating. She knew that
Baumgartner made certain representations as to the
receipts and disbursements and net profits of the
theater, and to her, they must have been quite attractive, as they were to Robinson; for in the next month,
February, she being in Spokane and Robinson in
Ellensburg operating the theater, she wrote or caused
to be written a letter over the name of her husband
to Robinson at Ellensburg, inquiring if the theater
were for sale, to which he replied, on February 21 as
follows:

"Some of your people were here, I believe, about
the time I purchased from Mr. Baumgartner, so you
understand all the conditions. I paid Mr. Baumgartner $750 for the assignment of his lease, and in addition all his advances for rent and for film service. I
will accept $1,000 for a similar assignment, purchaser
to repay in addition all amounts prepaid for rent and
film service beyond the date of my surrender of possession. I add the $250 to what I paid to cover expenses to which I have been put in making the purchase, advancing the business and some few supplies
added. If interested wire or write by return mail."

On February 23, respondent from Spokane, replied
to Robinson as follows:

"Received your letter this morning, and have read
over your proposition. Will state that we were over
at the time you purchased the Isis theater. Now what
we would like to know is this, would you consider it
on terms? If so, we could give $500 cash and $100
monthly. Of course we could pay rent of films and
would like to know if you had to make a deposit of
$250 to owner of building, and would we have to?
Kindly state what improvements you have made, and
state if those machines belong to the building or the
purchaser, and oblige."

On February 25 Robinson replied:

"Replying to your favor of the 23rd at first opportunity, will say that I would accept $500 cash which

you offer, and balance $100 per month if balance is secured by signers or otherwise, so that I could bank the notes. I paid all cash to Baumgartner, you know.

"Yes, I had to pay $250 on rent to apply on last months of lease and you would have to do so. Of course this is so much rent paid and leaves over two months at the end of the year on which you have no rent to pay.

"The improvements I have made consist only of some kalsomining, linoleum, new boards, printed matter, signs, etc. The machines belong to the building along with the equipment, wiring, seats, scenery, etc.

"It would cost you several thousand dollars to buy the equipment otherwise, and it is cheaper and better not to own it since you can rent it so cheaply. I shall await your prompt reply, as if I am to sell to you I desire to make other arrangements . . ."

On February 27, at 1.40 p. m., respondent wired Robinson at Ellensburg: "Can pay $500 and $250 rent; do not want to sign note for balance. Will sign contract to pay $100 monthly. Answer today."

On the same day, at 4:50 p. m., appellant wired:

"Will accept your offer. Advise date of your arrival here."

On February 27, from Spokane, respondent replied as follows:

"Got your message at 6:30 tonight, so will answer at once. Now it will be a few days before I can come, as my home is in Whitefish, Montana. I am leaving for there tonight to get our trunk, as we were just in Spokane on a visit, as my wife has been to see Mr. Baumgartner when she was there, so hold bargain open, as I will be there as soon as possible."

Appellants contend that these letters and telegrams constitute an unequivocal offer and acceptance of all the terms of the contract stated, and that they show that respondent had made an independent investiga-

tion and that Mrs. Jammie, the wife of respondent, had the same data as Robinson.

When respondent closed his case, appellants challenged the sufficiency of his evidence and moved for an instructed verdict for appellants, and upon appellants' counterclaim for the balance due under the contract, for the two hundred and thirty dollars advanced as rent, and the one hundred and twenty dollars due on the note. These motions were denied, although, in submitting the case to the jury, the court directed, as heretofore stated, a verdict for appellants on the one hundred and twenty dollar note. This denial of the challenge to the evidence is set up as error.

Appellants contend that respondent's evidence clearly showed: First, that a contract was made and entered into by correspondence; second, that the negotiations were opened by respondent Jammie on February 19, at which time appellant had been in possession but a short time; third, that appellant had made no representations whatever as to the moving-picture business up to the time respondent's offer was accepted; fourth, that respondent had conducted an independent investigation of the moving-picture business about the time Robinson purchased it, and that Mrs. Jammie, the wife, acting for respondent, obtained all her information from Baumgartner, who supplied her with the information as to the earnings of the theater; that respondent relied upon Baumgartner's statements of the earnings of the theater when the contract with Robinson was closed by wire; that all this information was made known to respondent and he possessed the same information as Robinson as to the earnings of the theater; fifth, that no payments beyond $846.70 were ever made on the contract by respondent and there was a balance due appellant of $550; sixth, that appellant paid $230 rent from

March 9 to May 9 in advance, which amount respondent agreed to repay, and that such sum had not been repaid. (Then follow several immaterial assertions under the submission of the case to the jury.) And, finally, it is contended that there was no change in the written contract over those contained in the correspondence heretofore set out.

On the other hand, respondent contends that the contention that no representations were made by Robinson prior to the execution of the contract cannot be sustained. It is conceded that Mrs. Jammie went to Ellensburg at about the time Robinson purchased the theater from Baumgartner and inquired about the theater from Baumgartner, and that Baumgartner made representations as to its earnings. What Baumgartner represented is shown by a statement of what he claimed the earnings to be while he operated the theater, and Robinson knew what Baumgartner had represented to Mrs. Jammie as to those receipts and that Baumgartner claimed that the average receipts were forty-eight dollars a day; and, it being shown that his (Robinson's) average receipts, as claimed by him, were only twenty-eight dollars a day, he knew that Baumgartner's figures were not reliable. Respondent therefore claims that, knowing that respondent's wife had talked to Baumgartner, it was Robinson's positive duty to inform respondent in his correspondence with him that the theatre was not making anywhere near the amount which Baumgartner claimed it was making, and that there was imposed on him the duty to speak, and that silence under such circumstances was just as fraudulent as a positive representation would have been.

12 R. C. L. 313 is quoted as follows:

"But where a matter is not equally open to the observation of both parties and is not discoverable by

the exercise of ordinary diligence, mere silence on the part of the one having the knowledge may constitute fraud. A reason given for this rule is that, since matters are not what they appear to be and the true state of affairs is not discoverable by diligence, deceit is accomplished by suppression of the truth.''

Respondent then contends that, since Robinson in his first reply to the inquiry of respondent referred to the time that Mrs. Jammie was in Ellensburg about the time Robinson purchased from Baumgartner, ''so you understand all the conditions,'' that amounts to a misleading representation. It is argued that this statement was in itself sufficient under the circumstances to make appellant's conduct fall outside of the general rule that mere silence does not constitute fraud. 12 R. C. L. is again quoted, at page 320, as follows, to support this position:

''Therefore each party to the contract must take care not to say or do anything tending to impose upon the other. The concealment becomes a fraud where it is effected by misleading and deceptive talk, acts, or conduct, or is accompanied by misrepresentations, or where in addition to a party's silence there is any statement, word or act on his part which tends affirmatively to a suppression of the truth, or to a covering up or disguising of the truth, or to a withdrawal or distraction of a party's attention from the real facts; then the line is overstepped and the concealment becomes a fraud.''

Accepting the above as a correct statement of the law governing the matter, we are of the opinion that, when Robinson referred to the conditions represented by Baumgartner as to the business of the theater when Mrs. Jammie was there, while Robinson was negotiating with Baumgartner, he adopted and made them his own. The question then is, whether or not the letters and telegrams constitute a completed contract.

In *McDonnell v. Coeur d'Alene Lumber Co.*, 56 Wash. 495, 106 Pac. 135, it was stated that:

"They had agreed upon the main questions, viz., the land to be logged, the price per thousand, and the place of delivery and time of payment, and about the time the work was to begin, and also that the contract should be reduced to writing wherein the details should be stated. But while these features had been agreed upon, they had not passed the stage of negotiations, because they had not been reduced to writing as the parties contemplated. The rule in such cases is stated in 9 Cyc. 280, as follows:

" 'Where parties are merely negotiating as to the terms of an agreement to be entered into between them, there is no meeting of minds while such agreement is incomplete. Thus, where they intend that their verbal negotiations shall be reduced to writing as the evidence of the terms of their agreement, there is nothing binding on them until the writing is executed.' "

The court also said in that opinion: "At most the parties were negotiating upon the terms of the agreement to be entered into between them." So in this case, it was shown by the letters themselves that the parties contemplated a written contract, and a written contract was drafted by Robinson himself and executed by the parties.

In *Stanton v. Dennis*, 64 Wash. 85, 116 Pac. 650, where the dispute was whether there was a completed contract or an agreement setting out some of the terms of a contract to be entered into later, and where the writings which had been exchanged contained the words, "formal contract to follow," and the word, "accepted," this court said:

"The face of the writing, it is at once apparent, indicates that it was intended as the latter rather than the former. After specifying certain particulars, it expressly provides that a formal contract is to follow.

If the writing itself was intended as the completed contract, there would have been no need for this proviso. A contract complete in itself does not need the sanction of another contract.''

To the same general effect is *Chinook Lum. & S. Co. v. McLane Lum. & S. Co.,* 107 Wash. 587, 182 Pac. 625.

When the parties met together in Ellensburg, on a Sunday, Robinson advised deferring the matter of drafting a contract and executing the same until the next day, and suggested himself, a lawyer, as a competent person to draw the contract.

It seems thoroughly apparent, therefore, that since the parties contemplated a formal and complete contract, they did not contemplate that the letters and telegrams constituted a completed contract. There had been, therefore, no meeting of minds when the parties met together in Ellensburg after the exchange of the letters and telegrams.

When they met in Ellensburg, Robinson showed respondent books, papers and contracts kept by Baumgartner and by himself; and, as respondent's evidence tends to show, represented that the theater was clearing $250 to $300 per month, and that its business was exactly as Baumgartner had told Mrs. Jammie. This again connects the first representation made by Robinson as to the conditions represented by Baumgartner to Mrs. Jammie with himself. He admitted in his own evidence that the theater, while he was running it, lost about $3.50 per day, instead of profiting, and that he did not inform respondent thereof.

We are therefore of the opinion that the case was a proper case to go to the jury on the questions of misrepresentation and deceit.

Appellants also attack the instruction to the jury as to the measure of damages which permitted respondent to recover the money paid less the note which he

had given to Robinson. Appellants insist that the proper measure of damages in an action such as this is only the difference between the actual value and the value as represented; citing *Hunt v. Allison,* 77 Wash. 58, 137 Pac. 322; *Bunck v. McAulay,* 84 Wash. 473, 147 Pac. 33; and *Parkhurst v. Elliott,* 103 Wash. 89, 173 Pac. 731.

That rule is applied in order to give the injured purchaser the benefit of his bargain and allow the highest measure of damages to which a party is entitled. But it does not preclude the recovery of moneys paid under a contract vitiated by fraud where no other benefits of the bargain are claimed or are allowed. *McRae v. Lonsby,* 130 Fed. 17; *Warwick v. Corbett,* 106 Wash. 554, 180 Pac. 928.

Under the contract entered into, respondent paid appellant $846.70. This was the amount, with interest from the date of payment, allowed by the trial court to be recovered upon the finding of the jury in favor of respondent, less the offset, which was made by the court, of the note.

Appellant contends that $230 of this amount should not be allowed because it was the payment of two months' rent in advance made by appellant; and the further sum of $146.70, deposited with the film exchanges; because those sums were sums for which respondent received the benefit. We can see no difference between these sums and any other sums paid for the theater business. The two months' rent in advance had been paid by appellant and respondent had agreed to repay it in the contract; and so with the sum deposited with the film exchanges. The $250 rent was for the last portion of the lease and was on deposit with the lessor and unused at the time the theater was given up; and all of these sums were part of the

$846.70 paid by respondent to appellant upon the execution of the contract.

On June 9, 1917, respondent tendered the theater back to appellants and the tender was refused. We do not consider that appellants can now claim recovery of the advance payments of rent for the last months of the lease to appellants, or the deposit for film exchanges.

Finding no reversible error, the judgment is affirmed.

MOUNT, MITCHELL, and TOLMAN, JJ., concur.

MAIN, J., concurs in the result.