[No. 31596.   Department One.   April 12, 1951.]

GEORGE G. CUNNINGHAM *et al., Respondents,* v. STUDIO
THEATRE, INC., *et al., Appellants.*[1]

[1]Reported in 229 P. (2d) 890.

*J. Orville Humphries* and *Arthur E. Florer*, for appellants.

*Robert Weinstein* and *E. A. Cornelius*, for respondents.

HILL, J.—In an action for rescission of an exchange of properties, misrepresentation and reliance thereon being conceded for the purposes of the appeal, the issues here are (a) whether the misrepresentations were of material facts or merely expressions of opinion, sales talk, etc., (b) whether the plaintiffs had a right to rely upon the misrepresentations made, and (c) whether the plaintiffs ratified the exchange of properties after having acquired knowledge of the falsity of the representations.

George Cunningham and his brother Glen and their wives owned a section of land with considerable timber on it. About twenty acres were cleared, and each family had a home and sheds for mink farming on the property; also, Glen had a small home-built sawmill, the operation of which was strictly a family affair, with Glen, his wife, and George as the only participants. The brothers valued their property at twenty-five thousand dollars.

George had a high school and Glen an eighth grade education. Their business experience was limited to their mink farm and sawmill.

They decided to dispose of their property because George wanted to secure better school facilities for his children and

Glen had suffered an accident that made it impossible for him to do manual labor. In an endeavor to effect a sale or trade, they sought the assistance of a neighbor who was a broker. He introduced them to A. C. Townsend and Roy R. Torpey, who were running the Studio Theatre in Spokane, and were men of considerable business experience. The ownership of the theater equipment and of the lease of the theater building was vested in a corporation, Studio Theatre, Inc., in which Townsend and Torpey and their wives owned all the stock. They had purchased the lease and theater equipment in March of 1949 for seven thousand dollars and had, since acquiring it, operated the theater at a loss.

Townsend represented to the Cunninghams that the theater had a value of twenty-five thousand dollars; also, that the replacement cost of the equipment was twenty-five thousand dollars. (There was evidence that the actual replacement cost of all the equipment Townsend and Torpey, or Studio Theatre, Inc., owned inside the theater was about twenty-four hundred dollars.)

During late July and early August, 1949, the parties negotiated for an exchange of their properties, each visiting the property of the others on more than one occasion. During the period when the Cunninghams visited the theater, what was referred to as an "exploitation" film of the "adult only" type was being shown. This apparently stimulated public interest, or at least the interest of a segment of the public, and resulted in an attendance that was considerably larger than normal.

Townsend prepared, in his own handwriting, two sets of figures which he explained to the Cunninghams. On one he showed receipts of ninety dollars a day and itemized expenses amounting to $57.70, leaving a net profit of $32.30 a day, which he represented as the average for their operation. The other set of figures he based on the assumption that the Cunninghams could perform certain portions of the work that made up the expense items and thus reduce the expenses to thirty-five dollars a day, thereby increasing the net profit to fifty-five dollars a day.

Believing the representations as to value and income, the Cunninghams entered into an exchange agreement with Studio Theatre, Inc., August 5, 1949, and the exchange was consummated shortly thereafter. Townsend and Torpey, rather than Studio Theatre, Inc., were named as grantees in the deed from the Cunninghams.

The Cunninghams commenced the operation of the theater August 15, 1949. For about sixty days thereafter they operated under the same policy and procedure as had their predecessors, having at Townsend's suggestion retained their manager, George Whitfield, in a like capacity. The theater lost money during that entire period. Whitfield testified that July, August, and September are the slow times of the year in the theater business, and that the 33-day race meet in Spokane in September and early October affected the show business adversely, and said:

"We weren't too alarmed the first two or three months. When we started to be alarmed was when the business didn't pick up at the normal pick-up time, or start to show an increase."

Business not having improved, in the latter part of October the Cunninghams changed the name of the theater and started a combination of stage shows (burlesque) and pictures, which policy they continued until they closed the theater January 22, 1950.

Early in January the Cunninghams had consulted an attorney. His investigations revealed that Townsend and Torpey had consistently operated at a loss. The Cunninghams immediately tendered back the theater and demanded a rescission. When it was refused, they continued to operate the theater for about two weeks, then closed it and commenced this action for rescission January 23, 1950.

The trial court accepted the foregoing version of the facts. After an inspection of the properties that had been exchanged, the trial judge expressed the view that the property the Cunninghams had conveyed to Townsend and Torpey was worth four or five times as much as the theater and all its equipment. From a decree granting rescission,

Townsend and Torpey and their wives, together with Studio Theatre, Inc., appeal.

The appellants, realizing that the trial court had a right to believe the respondents' version of the transaction, concede, for the purposes of this appeal, that they made the representations hereinbefore referred to and that those representations were false. They also concede, impliedly at least, that the respondents relied upon those representations. But they urge that the misrepresentations were not of material facts but were merely opinion or sales talk, and that, in any event, the respondents were not entitled to place reliance on them.

■ Appellants rely upon what they call the general rule that an expression of value is but opinion and not such a fact as may be the basis of actionable fraud. *Pigott v. Graham,* 48 Wash. 348, 93 Pac. 435; *Jacoby v. Hollada,* 78 Wash. 88, 90, 138 Pac. 558; *Hood v. Cline,* 35 Wn. (2d) 192, 212 P. (2d) 110; 23 Am. Jur. 827, Fraud and Deceit, § 57; 1 Black on Rescission and Cancellation 214, §§ 79-85.

However, this rule is not absolute, and it is not the law that an expression of value is always an opinion and never a material fact. *Duffy v. Blake,* 80 Wash. 643, 141 Pac. 1149; *Horowitz v. Kuehl,* 117 Wash. 16, 18, 200 Pac. 570, 23 Am. Jur. 830, Fraud and Deceit, § 59; 1 Black on Rescission and Cancellation, *supra.* Indeed, the so-called general rule has been whittled down until it can be said that it

". . . applies only where the parties stand on an equal footing, and have equal means of knowledge, and there is no relation of trust or confidence existing between them." 23 Am. Jur. 830, Fraud and Deceit, § 59.

The same section continues:

"Likewise, a statement of value may be of such a character, so made and intended, and so received, as to constitute fundamental misrepresentation; and if it is made as an assertion of fact, and with the purpose that it shall be so received, and it is so received, it may amount to a fraud. Moreover, a statement of value involving and coupled with a statement of a material fact is fraud."

The trend of the decisions on the subject is that ". . . the standards of the law are rapidly overtaking the standards of ethics, and the gap between 'moral honesty' and 'law honesty' is beginning to close." 1 Black on Rescission and Cancellation 232, § 85.

Our investigation leads us to the conclusion that most cases involving false statements of value, such as "This property is worth twenty-five thousand dollars," do not actually hinge, so far as the determination of the presence or absence of fraud is concerned, upon whether the statement is an expression of opinion, sales talk, etc., or a misrepresentation of a material fact, but upon whether the person to whom the statement was made justifiably relied thereon. (Justifiable reliance is a combination of the two elements, reliance and the right to rely.)

In this case, it is not necessary for us to determine whether the statement that the value of the theater was twenty-five thousand dollars was a misrepresentation of a material fact or an expression of opinion; nor is it necessary that we determine whether the statement that it would cost twenty-five thousand dollars to replace the equipment was a misrepresentation of a material fact or an expression of opinion.

It is too clear for argument that Mr. Townsend's detailed explanation of receipts and disbursements, which showed that the theater was netting $32.30 a day, was a misrepresentation of a material fact. *Boehme v. Broadway Theater Co.,* 91 Wash. 104, 157 Pac. 218; *Jammie v. Robinson,* 114 Wash. 275, 195 Pac. 6; *Hahn v. Brickell,* 135 Wash. 189, 237 Pac. 305; *Frahm v. Moore,* 168 Wash. 212, 11 P. (2d) 593; *Miller v. Frederick,* 171 Wash. 452, 18 P. (2d) 40; *Weaver v. Blochberger,* 31 Wn. (2d) 877, 199 P. (2d) 589; 23 Am. Jur. 841, Fraud and Deceit, § 68; 1 Black on Rescission and Cancellation 224, § 83.

The cases just cited make it equally clear that the Cunninghams justifiably relied upon that misrepresentation. They had practically no business experience, none in the operation of theaters; and Townsend was speaking of matters of which he had personal knowledge.

Appellants urge that the attendance records for the period of the Townsend and Torpey operation were available and could have been examined, and, therefore, the Cunninghams, having failed to examine them, cannot be heard to say that they relied upon the representation of an income of ninety dollars a day. Appellants rely upon *Christiansen v. Parker,* 152 Wash. 149, 277 Pac. 445, and *Bruckart v. Cook,* 30 Wn. (2d) 4, 190 P. (2d) 725. These cases had nothing to do with representations of the character of that with which we are here concerned. In the *Christiansen* case, the plaintiffs complained that the number of acres that had been cleared had been misrepresented; and in the *Bruckart* case the plaintiff complained that he had not been told that a house occupied part of a public alley. The actual situation in each instance was obvious.

More nearly analogous to the present case is *Duffy v. Blake,* 80 Wash. 643, 141 Pac. 1149, involving the sale of a half interest in a secondhand store. The value of the goods in the store and the profits for the preceding year had been grossly misrepresented. It was there contended that the plaintiff was an experienced businessman and the books of the business were available for his examination, and he had no right to rely upon the representations. We indicated that there was some doubt as to whether anyone except an experienced bookkeeper could have told the condition of the business from the books, and said:

"While it is true that the means of acquiring knowledge of the character of the goods was open to Mr. Duffy, and while the profits of the business, as shown by the books of account, were open to him, in order to acquire this knowledge it was necessary for him to make an investigation of the stock of goods and of the books. He did not attempt to do this; and we think he was not required to do it, but might rely upon the positive statements of Mr. Blake as to the value of the goods and as to the profits which had been theretofore made. We think this is especially so when the inventory was taken by Mr. Blake who knew that Mr. Duffy did not know the value of the goods, and knew that in all probability he would not inquire further as to the value of the goods, or as to the amount of profits that had been there-

tofore made. Upon the undisputed testimony of Mr. Duffy and his witnesses, we are satisfied that it was the duty of the court to submit the case to the jury, under the rule above stated."

The "rule above stated" was a quotation from 14 Am. & Eng. Ency. Law (2d ed.) 120, 121, which had been quoted in *Wooddy v. Benton Water Co.*, 54 Wash. 124, 102 Pac. 1054, 132 Am. St. 1102, and *Stewart v. Larkin*, 74 Wash. 681, 134 Pac. 186, and which reads as follows:

"By the overwhelming weight of authority, ordinary prudence and diligence do not require a person to test the truth of representations made to him by another as of his own knowledge, and with the intention that they shall be acted upon, if the facts are peculiarly within the other party's knowledge or means of knowledge, though they are not exclusively so, and though the party to whom the representations are made may have an opportunity of ascertaining the truth for himself.

"By the weight of authority, and in reason, the rule that a person who is voluntarily blind as to facts concerning which false representations are made cannot complain of the same, applies only where the parties have equal present opportunity and means to ascertain the truth at the time of the transaction, and does not apply merely because it is possible to ascertain the facts. Indeed, it has been held that a person is justified in relying on a representation made to him, in all cases where the representation is a positive statement of fact, and where an investigation would be required to discover the truth."

A somewhat later statement of that rule is found in 23 Am. Jur. 970, Fraud and Deceit, § 161, where it is said:

"The rule is followed at the present time in practically all American jurisdictions, in respect of transactions involving both real and personal property, that one to whom a positive, distinct, and definite representation has been made is entitled to rely on such representation and need not make further inquiry concerning the particular facts involved. This rule is a corollary to the broad principle of a general right of reliance upon positive statements. Under this rule it is sufficient if the representations are of a character to induce action, and do induce it, and the only question to be considered is whether the misrepresentations actually deceived and misled the complaining party. Under

such circumstances, it is immaterial that the means of knowledge are open to the complaining party, or easily available to him, and that he may ascertain the truth by proper inquiry or investigation."

█ Naive and credulous as the Cunninghams may have been, we have long since indicated that wrongdoers cannot shield themselves from liability by asking the law to condemn the credulity of their victims. *Wooddy v. Benton Water Co., supra; Stewart v. Larkin, supra.*

█ We are satisfied that fraud is here established by clear, cogent, and convincing evidence, and, unless respondents in some way affirmed this transaction after acquiring knowledge of the falsity of Townsend's statements, they are entitled to the judgment of rescission rendered in their favor. The facts upon which the claim of affirmation or ratification is based are that the respondents urged the broker who had introduced them to Townsend and Torpey, to effect a sale or trade of the theater; the listing of the property for sale in the magazine "Box Office" as late as December 28, 1949; their change in the name of the theater and the type of show; and their failure to complain to Townsend or Torpey on the occasions when they met during the last four months of 1949.

█ For any of these circumstances to be evidence of an affirmance or ratification of the exchange, they must have followed discovery of the fraud. 24 Am. Jur. 36, Fraud and Deceit, § 210.

The respondents relied on Whitfield to manage the theater, and he testified as to why he had not been concerned about the losses sustained during the first two months of respondents' operation; and that, when business did not pick up in October, they endeavored to stimulate business by various means, including a change of theater name and the use of stage shows. The respondents insist that they had no knowledge of the falsity of Townsend's representations until January, 1950; and the trial court made the finding

". . . that they [respondents] did not learn that the representations made by said defendants [appellants] and

upon which they relied in purchasing the theatre had been false and fraudulent until approximately the second week of January, 1950, at which time, through their attorney, they made an examination both as to the earnings and as to the expenses of said theatre while the same was being operated by the defendants."

Appellants insist, in effect, that the respondents should not have believed Townsend in the first place, and that, in any event, the respondents should have determined by the latter part of October, 1949, that Townsend had been guilty of misrepresentation.

As the trial judge pointed out in his summation of the case, two inexperienced "boys" do not lightly or hastily conclude that they have been defrauded by "two substantial citizens, who are impressive in their conversation, impressive in their bearing, and men of substance."

We find here no reason to challenge the finding of the trial court as to the date of discovery of the fraud, *i.e.*, January, 1950. All of the acts of affirmation relied upon occurred prior to that date; hence, there has been no such ratification of the transaction as would be a waiver of the right to rescind. *Algee v. Hillman Inv. Co.*, 12 Wn. (2d) 672, 123 P. (2d) 332; *Thompson v. Huston*, 17 Wn. (2d) 457, 135 P. (2d) 834.

Nor did the continued operation of the theater for some two weeks following discovery of the fraud constitute any bar to the rescission. The respondents acted with reasonable promptitude within the purview of the rule that the right to elect to rescind a contract or transaction on the ground of fraud must be exercised promptly upon discovery of the fraud. 24 Am. Jur. 32, Fraud and Deceit, § 208.

The judgment is affirmed.

SCHWELLENBACH, C. J., BEALS, GRADY, and DONWORTH, JJ., concur.