50 P.3d 284 (2002)
112 Wash.App. 558
Vern WESTBY, Respondent,
v.
Alan and Cheryl GORSUCH, and the marital community comprised therein, d/b/a Sanford and Sons, Alan Gorsuch, an individual, Appellants.
No. 26013-1-II.
Court of Appeals of Washington, Division 2.
July 19, 2002.
*286 Martin J.H. Duenhoelter, Tacoma, for Appellants.
Erik Jon Bjornson, Tacoma, for Respondent. *285

*287 PART PUBLISH OPINION
SEINFELD, J.
Vern Westby sold a Titanic survivor's "Inspection Card" to an antique dealer who resold the item for a large profit. Relying on a theory of fraudulent or negligent misrepresentation, Westby sued and recovered a portion of that profit. On appeal, the dealer asserts, among other claims, that the evidence was insufficient to prove justifiable reliance. But the evidence viewed in the light most favorable to Westby was sufficient to support the verdict. Finding no other reversible error, we affirm.

FACTS
On October 20, 1998, Vern Westby sold a Titanic "Inspection Card" (the ticket) and a number of related postcards to Alan and Cheryl Gorsuch, the owners of Sanford & Son Antiques and Auctions, for $1,000. Anna Sofia Sjoblom, a survivor of the ill fated trip and a relative of Westby's first wife, originally owned the ticket and some of the post cards. About six months after the Gorsuch's purchased these items, they sold the ticket at a nationally advertised auction for $100,000 plus a $10,000 "buyer's premium." V Report of Proceedings (RP) at 274. They also sold most of the postcards for a total of over $1,200.
Westby sued the Gorsuchs, alleging several causes of action including fraudulent or negligent misrepresentation. The Gorsuchs counterclaimed for defamation and Westby then moved for summary judgment on the defamation counterclaim.
Eight days before the summary judgment hearing, the Gorsuchs filed a copy of a May 24, 1999, Tacoma News Tribune article and a memorandum of law; they did not attach any supporting affidavits or declarations. The memorandum quoted the following statements attributed to Westby in the article: "`I really got taken on this thing,'" and "`He should have been fair and square.'" Clerk's Papers (CP) at 98. The memorandum also said that Westby had given "interviews to several different news agencies" in which he made statements inferring that Gorsuch was dishonest, that the media published these statements, and that these statements were "libel per se."[1] CP at 98.
The trial court found that the Gorsuchs had failed to raise issues of material fact. Thus, it dismissed the counterclaim with prejudice.
Westby testified at trial that in October 1998, he and his new wife were in debt and wanted to sell some items to obtain funds to pay bills. He considered selling the ticket and postcards, but he lacked the ability to investigate the ticket's value because he had no computer, no "insights" or "help," and did not know where to go to for information. IV RP at 147.
Westby testified that before he went to Sanford & Sons, he was completely unaware of the ticket's value. He said that his son had tried to help him by discussing the ticket in a computer chat room, but Westby denied that he or his son ever tried to sell the ticket on the Internet. Westby did know that his son had received a $500 offer for the ticket from an antique dealer at an antique show.
The Westbys selected Sanford & Sons from an advertisement in the Yellow Pages. Westby's wife called the shop, told the person *288 she spoke to that they had a Titanic "ticket," and made an appointment. IV RP at 98. Westby did not think Alan Gorsuch was an expert on Titanic materials but he knew "[Gorsuch] was the biggest antique dealer in Tacoma and that he dealt in a lot of different artifacts." IV RP at 123.
Upon arriving at Sanford & Sons, Westby spoke with Alan Gorsuch and told him that he needed the money immediately. Westby then explained that the ticket had belonged to Sjoblom, a third class passenger who survived the sinking of the Titanic with the ticket pinned to the inside of her coat. Westby's first wife later inherited the ticket along with an album containing 300 to 400 postcards, some of which related to Sjoblom or the Titanic. Westby's first wife died in 1997.
Westby asserted that after Gorsuch examined the ticket, he asked Gorsuch what the ticket was worth, and Gorsuch responded, "it's not worth nothing." IV RP at 101. Westby then showed Gorsuch the postcard album and asked what it was worth. Gorsuch said that he would need to look at the postcards and he asked the Westbys to go have a cup of coffee and come back later.
The Westbys left and returned to the shop about 50 minutes later. In response to Westby's question about the album's value, Gorsuch said "`it ain't worth nothing[,]'" and showed him a drawer full of postcards that he said were worth fifty cents to a dollar each. IV RP at 103. Westby asked about the ticket again and Gorsuch told him that "[h]e couldn't fetch $500" for it. IV RP at 105.
Westby stated that he "didn't know what to do" but because he needed the money and believed that as an antique dealer Gorsuch was "well-informed about the memorabilia and things," he decided that "the only thing [he] could do [was] ask if he'd give [him] a thousand dollars for both[.]"[2] IV RP at 104. Gorsuch accepted the offer without either bargaining, making a counter offer, or offering any auction or consignment services. Gorsuch did not ask if the ticket was authentic, but he closely scrutinized it and appeared satisfied.
When questioned about his $1,000 asking price, Wesby explained:
[Westby] Well, I based it on that the knowledge that he had, that he believed that it was worthless, but yet it might be worth something to him, so that came up withfor both. I asked him if he'd give me a thousand dollars for both. I figured he might be able to get something out of it.
[Plaintiff's Counsel] And was it based on what he told you that day[?]
[Westby] Yes.
IV RP at 144-45.
The Gorsuchs' counsel asked Westby on cross examination what "would have prevented you from going and seeking another opinion?" IV RP at 135. Westby's counsel objected, stating: "Seller of goods is never under a duty to get another opinion when a fraud has been committed." IV RP at 135. The trial court sustained this objection.
The Gorsuchs and their employee, Vicki Smith, described the meeting with Westby differently. They denied telling him anything about the ticket's value and asserted that Westby had the asking price of $1,000 in mind when he arrived at the shop. They said that Westby said he was asking $1,000 because this was the highest offer he received when his son put the ticket up for sale on the Internet and that he did not accept the Internet offer because he needed the money right then.
Gorsuch testified that he had no specific experience with Titanic-related items and that the ticket was not what he had envisioned because "Inspection Card" rather than the word "ticket" was printed on it. Further, the word "Adriatic" was printed on the ticket and then crossed out and the word "Titanic" stamped next to it. But Westby explained this discrepancy as due to the fact that Sjoblom had been transferred to the Titanic because of a coal strike; he said *289 that Sjoblom's story was "in the book." VI RP at 624. Gorsuch later discovered the book, A Night to Remember, that told about the Titanic's voyage and included Sjoblom's story.
Gorsuch said that after he listened to Westby's story he believed the ticket was an authentic item from a Titanic survivor but he was not sure that it was a passenger ticket because it did not say "ticket" on its face. Further, he said that the ticket was not in the best condition; it was creased on the bottom, the date on it was unclear, and it was separated into two pieces.
Gorsuch testified that he initiated the discussion about price by asking Westby how much he wanted for the ticket. When Westby said $1,000, Gorsuch told him the price was too high and asked him how he had arrived at it. Westby then explained the Internet offer.
Although Gorsuch asserted that he did not know the ticket's value when Westby came into his shop, he was aware that a post card mailed from the Titanic had recently sold for approximately $800. Consequently, he asked the Westbys for time to look at the postcards to see if any of them had been sent from the Titanic.
Upon determining that the album had belonged to Sjoblom's aunt, not to Sjoblom; that it contained only a few items related to Sjoblom; and that none of the cards were mailed from the Titanic, he was not too interested in it. Nonetheless, he agreed to pay the $1,000 price for both the ticket and the postcards because he knew he could get a few hundred dollars for the postcards and had already decided that he would purchase the ticket if he could get it for under $1,000.
After purchasing the ticket, Gorsuch kept it in a showcase and occasionally showed it to people he thought might find it interesting. He offered it to one of his regular customers for $6,000 but rejected the customer's counter offer of $4,000. Gorsuch said that he first discovered the potential value of the ticket after Smith researched it on the Internet.
Sanford & Sons advertised the October 20, 1998 auction with a printed auction catalog that displayed the ticket and other items on its front cover and contained approximately 1000 items inside. Gorsuch also advertised nationally, issued press releases, and contacted the media about the ticket.
One press release quoted Gorsuch as saying, "Whether it sells for $5,000 or $25,000, it will sell[.]" V RP at 264. He also stated that "`Either way, we will hold the world's record for whatever price it brings because there is no track record for a complete or any Titanic ticket ever crossing the block[.]'" V RP at 264. Gorsuch testified that the night before the auction, he estimated that the ticket might bring as much as $50,000 at auction.
The Gorsuchs arranged to accept bids by telephone and over the Internet. The bidding for the ticket started at $5,000 and, within a minute, it had reached the $100,000 top bid price.
Gorsuch testified that he has been in the antique business for 30 years, 15 in the same location, but has not had any formal training in the field. He also testified that he makes frequent buying trips to Europe and liquidates estates. But he does not regularly deal in collectables or memorabilia.
According to Gorsuch, Sanford & Sons generally tries to sell items for approximately two to two and a half times their purchase price, basing prices primarily on past experience, cost of the item, and rarely, if ever, on other people's opinions or independent research. Further, the business does not do appraisals; instead, Gorsuch asks the seller to name a price.
Taylor Bowie, an antique dealer, testified for Westby. Bowie had experience dealing with printed memorabilia and had frequently been consulted about Titanic materials. He described some of the factors affecting the value of historical artifacts, including condition, rarity, the event the item is related to, how closely the item is related to the actual event, and supply and demand. The closer the connection to the actual event, the more valuable the item.
According to Bowie, there has always been a good demand for Titanic items, with the highest demand for items directly connected to passengers, in part because of scarcity. *290 Bowie testified that items related to Sjoblom, even postcards, would have value because she became a "de facto celebrity" simply by virtue of surviving the sinking. V RP at 370.
Bowie stated that the ticket appeared to be in "very very good" condition, that very few items from the passengers survived the sinking, and that he was not aware of any other such item ever changing hands. V RP at 358. He opined that because of the ticket's condition and rarity it would have considerable value.
Bowie also gave his opinion about Gorsuch's ability to recognize the ticket's value. Based on deposition testimony, on photographs of Sanford and Sons, on the auction catalog, and on the fact that Sanford & Sons was one of the largest and best known antique shops in the Puget Sound area and that Gorsuch was "generally known in the trade as one of the major players in antiques and collectables" in the area, Bowie concluded that someone with Gorsuch's background "would certainly have an understanding of the value of a piece like this[.]" V RP at 360-62.
Bowie testified that a collectable materials dealer can usually estimate an item's value within a range, even though no identical item has ever been sold, although it may be impossible to specify an exact value. He said that a person with Gorsuch's broad background and experience should be able to identify the ticket and postcards as extremely valuable and should know where to go to get additional information. According to Bowie, it would not be truthful to state that an item such as the ticket could not "fetch" $500. V RP at 364.
When Bowie first heard about the ticket, he estimated its value at $25,000 to $50,000. If someone had offered to sell him an item like the ticket, he would tell the seller if he thought it was valuable, place a value on it, and then discuss terms. He would feel obligated to be "as forthcoming as required" and would possibly suggest a consignment arrangement. V RP at 388. Bowie acknowledged, however, that there is no uniform standard of operations for antique dealers.
Rick Carlson, a Tacoma antique dealer who advertises in the Yellow Pages, testified for Gorsuch. Carlson said that in October 1998, he received a call from "a gentleman that was asking about some values about the ticket." V RP at 466. Carlson told the caller that he would have to see the item before he could actually place a value on it, but he gave the caller a "kind of round ball figure" of $500 over the telephone. V RP at 468. Carlson said that this value was sheer speculation based on the mere fact "that it could have some value because it was a Titanic ticket." V RP at 469. No one ever brought the item into Carlson's shop.
At the close of Westby's case, the Gorsuchs moved for a directed verdict. After the trial court denied the motion, the jury returned a general verdict for the Westbys of $18,700. The Gorsuchs then moved for judgment as a matter of law, which the trial court denied.

DISCUSSION

I. NEGLIGENT/FRAUDULENT MISREPRESENTATION
A. Standard of Review
The Gorsuchs argue that the trial court erred when it denied their motions for a directed verdict and for judgment as a matter of law on the fraudulent and negligent misrepresentation claims. In reviewing this argument, we examine the evidence in the light most favorable to the nonmoving party and ask whether the evidence was sufficient to support the jury's verdict. Stiley v. Block, 130 Wash.2d 486, 504-505, 925 P.2d 194 (1996); Hizey v. Carpenter, 119 Wash.2d 251, 271-72, 830 P.2d 646 (1992).
B. Fraudulent Misrepresentation
To prove fraudulent misrepresentation, Westby had to establish the following nine elements by clear, cogent, and convincing evidence: (1) Gorsuch made a representation of an existing fact; (2) the factual representation was material; (3) it was false; (4) Gorsuch knew it was false; (5) he intended that Westby act on the false representation; (6) Westby was ignorant of the falsity of the *291 representation; (7) Westby relied on the false representation; (8) Westby had a right to rely on this representation; and (9) Westby suffered damages due to his reliance on the false representation. Stiley, 130 Wash.2d at 505, 925 P.2d 194.
1. Representation of an Existing Fact
According to Westby, Gorsuch told him the postcards were worthless and initially said that the ticket was worth nothing and later said that he could not get $500 for it. Although Gorsuch denied making these statements and asserted that he only asked Westby to name his price, it is the jury's role to make credibility determinations. Malnar v. Carlson, 128 Wash.2d 521, 536, 910 P.2d 455 (1996). Westby's testimony is sufficient to show that Gorsuch represented that the ticket had minimal value.
The Gorsuchs contend that even if Gorsuch made the above comments, they were merely expressions of personal opinion about potential future value and not representations of existing fact. But although representations of value are statements of opinion, see RESTATEMENT (SECOND) OF TORTS § 538A (1977), such statements may also be factual representations if (1) the defendant made the representation intending to induce the plaintiff to act; (2) the relevant information was not readily available to the plaintiff; and (3) the circumstances otherwise indicated that the plaintiff was entitled to rely on the representations as fact:
"Whenever a party states a matter, which might otherwise be only an opinion, and does not state it as the mere expression of his own opinion, but affirms it as an existing fact material to the transaction, so that the other party may reasonably treat it as a fact, and rely and act upon it as such, then the statement clearly becomes an affirmation of fact within the meaning of the general rule, and may be a fraudulent misrepresentation. The statements which most frequently come within this branch of the rule are those concerning value[.]"
Stack v. Nolte, 29 Wash. 188, 196, 69 P. 753 (1902) (emphasis omitted) (quoting 2 POMEROY, EQUITY JURISPRUDENCE, §§ 878, 879). See also Boonstra v. Stevens-Norton, Inc., 64 Wash.2d 621, 624, 393 P.2d 287 (1964);[3]Cunningham v. Studio Theatre, Inc., 38 Wash.2d 417, 421, 229 P.2d 890 (1951); Jacoby v. Hollada, 78 Wash. 88, 90-91, 138 P. 558 (1914). Thus, it was appropriate for the jury to review Gorsuch's representations in the context of all the evidence and determine whether they fit the definition of representations of existing fact. See Eyers v. Burbank Co., 97 Wash. 220, 227, 166 P. 656 (1917); City of Tacoma v. Tacoma Light & Water Co., 17 Wash. 458, 478, 50 P. 55 (1897), overruled in part on other grounds by Parkhurst v. Elliott, 103 Wash. 89, 92, 173 P. 731 (1918).
The Gorsuchs also argue that antiques have no inherent value. But the relevant statements were representations as to the items' then market value, not an assertion of fact about inherent values.
The Gorsuchs' argument that the alleged representations did not relate to an existing fact is equally unpersuasive. A representation of an existing fact must exist independently of (1) any future acts or actions on the part of the party making the statement; (2) the occurrence of any other particular event in the future; and (3) the particular future uses of the person to whom the statement is made. North Pac. Plywood, Inc. v. Access Rd. Builders, Inc., 29 Wash. App. 228, 232, 628 P.2d 482 (1981). But Westby was not seeking an opinion about the ticket's potential future market value; he was looking for a purchaser who would pay him cash that day based on a fair valuation of the ticket at that time.
2. Material Fact
The Gorsuchs do not challenge this element.
*292 3. Falsity
A jury could reasonably conclude that Gorsuch's statements were false because Gorsuch himself testified that he was willing to pay more than $500 for the ticket and he believed that he could get at least a couple of hundred dollars for the postcards on the day he made the representations. He paid $1,000 for the two items and he would have been willing to purchase the ticket alone for $750 to $800. A reasonable inference from this evidence is that Gorsuch believed the value of the ticket and postcards exceeded the valuations he gave Westby. See Grant v. Huschke, 74 Wash. 257, 263, 133 P. 447 (1913).
4. Gorsuch's Knowledge of Falsity
The above described testimony would also allow a jury to find that Gorsuch knew his statements were false. Further, Gorsuch testified that he was aware that a postcard from the Titanic had sold for $800. The evidence in context supports a finding that Gorsuch knew that anything directly related to the Titanic had a potentially high value.
5. Intention that Westby Act on the Representation
The Gorsuchs argue that there is no evidence that Gorsuch intended that Westby rely on the alleged representations. Again, although some evidence supports the Gorsuchs' position, there also were competing reasonable inferences that, if believed, could prove this element.
Gorsuch believed the ticket was an authentic item from the Titanic but he nonetheless asked Westby to accept less than $1,000 for it in the hopes of talking him down $200 to $250 dollars. This and Gorsuch's statement that the ticket was either valueless or worth less than the $500, supports a reasonable inference that Gorsuch was attempting to persuade Westby to lower his price.
6. Westby's Ignorance of Falsity
The Gorsuchs do not challenge this element.
7. Reliance
The Gorsuchs allege that "[t]he only evidence offered to prove Mr. Westby's reliance was his own testimony" that he based his decision to ask $1,000 for both items on Gorsuch's representations. Br. of Appellants at 24. They assert that this testimony does not constitute clear, cogent, and convincing evidence of reliance. We disagree.
This testimony, if believed, is adequate to prove that Westby relied on Gorsuch's representations when he decided to request $1,000 for both items. Admittedly, the testimony contains a contradictory element. Westby also stated that he "figured he might be able to get something out of it," indicating his belief that the items had a value to Gorsuch despite his representations that they did not. IV RP at 144. But the evidence supports a finding that Gorsuch persuaded Westby that the items did not have a significant value.
8. Justifiable Reliance
The Gorsuchs argue that Westby did not have a right to rely on the representations because this was an arms length transaction and Westby had access to the same information as Gorsuch (and perhaps even more). He also asserted that Westby failed to use due diligence to protect himself in this transaction.[4]
According to the Restatement, parties with the same experience are not entitled to rely on one another's opinions:
The recipient of a fraudulent misrepresentation solely of the maker's opinion is not justified in relying upon it in a transaction with the maker, unless the fact to which the opinion relates is material, and the maker
(a) purports to have special knowledge of the matter that the recipient does not have, or *293 (b) stands in a fiduciary or other similar relation of trust and confidence to the recipient, or
(c) has successfully endeavored to secure the confidence of the recipient, or
(d) has some other special reason to expect that the recipient will rely on his opinion.
RESTATEMENT (SECOND) OF TORTS § 542 (emphasis added). Reliance is not justified if both parties have approximately equal competence to form a reliable opinion on the subject matter. RESTATEMENT (SECOND) OF TORTS § 542 cmt. d.
The representee is deemed to be competent to form an independent opinion regarding a transaction if the transaction relates to something of common experience and to an ordinary commodity. RESTATEMENT (SECOND) OF TORTS § 542 cmt. d. But it may be justifiable to rely on another's opinion if the transaction requires complex knowledge or specialization:
In this case if the one party has special experience or training or purports to have them, the other, if without them, is entitled to rely upon the honesty of the former's opinion and to attach to it the importance that is warranted by his superior competence. The ordinary purchaser of jewelry cannot be expected to know the quality or value of the gems shown to him by a jeweler. He must rely and is therefore justified in relying upon the jeweler's statement that a diamond is of the first water; and, after making allowance for the natural tendency of a vendor to praise his wares, he is justified in relying upon the jeweler's statement of the value of the diamond.... On the same basis, the ordinary purchaser of antiques is entitled to rely upon the statement of a vendor who specializes in such articles that a piece of furniture is an antique and not a modern imitation.
RESTATEMENT (SECOND) OF TORTS § 542 cmt. f.
Generally, when there is a positive, distinct, and definite representation, the representee has no duty to investigate the truth of the representation. Rummer v. Throop, 38 Wash.2d 624, 633, 231 P.2d 313 (1951); Cunningham, 38 Wash.2d at 423-24, 229 P.2d 890. But the issue of justifiable reliance also "involves the question of [the plaintiff's] diligence in ascertaining the facts for himself ... [and] his exercise of care and judgment in acting upon representations which run counter to knowledge within his possession or reach." Rummer, 38 Wash.2d at 633, 231 P.2d 313. See also RESTATEMENT (SECOND) OF TORTS § 541A cmt. a (representee has right to rely unless "its falsity is obvious to him (see § 541), or he has reason to know of facts which then make his reliance unreasonable. (see § 540).").
Here, viewing the evidence in the light most favorable to Westby, he trusted Gorsuch to give him truthful information because (1) Gorsuch was an antique dealer; (2) Westby believed that Gorsuch had significant experience in the field of antiques and collectables, although not necessarily in the specific area of Titanic materials; and (3) Gorsuch took at least 50 minutes to examine the items. Westby also specifically asked Gorsuch to value the items and said that he needed the money immediately. And Gorsuch had the resources to obtain information about fair value if he lacked experience with an item.
This evidence supports a reasonable inference that Gorsuch had a far more sophisticated and accurate understanding of how to value items such as the ticket and postcards than Westby, and Westby should have been able to rely on Gorsuch's representations. That Westby had already received a $500 Internet offer for the ticket did not necessarily put him on notice that Gorsuch's representations as to what the items could bring in the immediate case were not accurate or truthful.
9. Damage
The Gorsuchs assert that there is insufficient evidence of damage because Westby presented no evidence related to the ticket's value on October 20. But Bowie testified that when he heard about the ticket, he estimated that its value was between $25,000 and $50,000. And shortly after Gorsuch purchased the ticket, a customer *294 offered him $4,000 for it, an offer that Gorsuch rejected. This combined with Gorsuch's testimony that he usually priced items at twice to two and a half times the purchase price clearly shows that the ticket alone was worth more than $1,000 at the time Westby sold it.
Thus, there is sufficient evidence to support each element of the fraudulent misrepresentation claim and the trial court did not err when it denied the Gorsuchs' motions for a directed verdict and for judgment as a matter of law.
C. Negligent Misrepresentation
The jury was instructed on both fraudulent and negligent misrepresentation and returned a general verdict of liability. Thus, we also address the Gorsuchs' challenges to the evidence supporting the negligent misrepresentation claim.
Washington has adopted the Restatement (Second) of Torts with respect to the elements of negligent misrepresentation. ESCA Corp. v. KPMG Peat Marwick, 135 Wash.2d 820, 826, 959 P.2d 651 (1998). Section 552(1) of the Restatement describes negligent misrepresentation as:
One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
See also, ESCA Corp. 135 Wash.2d at 826, 959 P.2d 651. The plaintiff must prove each element of the claim by clear, cogent, and convincing evidence. Havens v. C & D Plastics, Inc., 124 Wash.2d 158, 181, 876 P.2d 435 (1994).
Additionally, unless the party making the representation is under a public duty to provide the information, this liability is limited to loss suffered:
(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information...; and
(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
RESTATEMENT (SECOND) OF TORTS § 552(2). See also RESTATEMENT (SECOND) OF TORTS § 552(3).
As discussed above, the record supports the conclusion that Gorsuch made representations to Westby that the ticket was valueless; that he could not get $500 for the ticket; and that the postcards were worthless. There also is sufficient evidence that these representations were false, that Gorsuch made these representations in the course of his business for Westby's personal benefit and guidance, and that Westby justifiably relied on these statements.
Finally, the evidence was sufficient to find that Gorsuch either knew that the value of the items exceeded his representations or to find that had he failed to exercise reasonable care or competence in obtaining information about the items; he should have known that the ticket was worth at least $500, and that the postcards had some unique value. That a postcard mailed from the Titanic had sold for approximately $800 should have put him on notice that items directly related to the Titanic were valuable. Additionally, Bowie testified that someone with Gorsuch's background would have experience estimating value and would have been aware that items directly connected to the actual event or to survivors were potentially very valuable.
Accordingly, the trial court did not err in denying the Gorsuchs' motions for a directed verdict and for judgment as a matter of law on the negligent misrepresentation claim.
A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be *295 filed for public record pursuant to RCW 2.06.040, it is so ordered.
We concur: BRIDGEWATER, J., and QUINN-BRINTNALL, A.C.J.
NOTES
[1] The article attributed the following statements to Westby:

"When I heard the news, I thought, `Oh, my God, no" (sic) Westby said. "I sat there and cried. I really did. I really got taken on this thing."
Westby thinks Alan Gorsuch, the owner of Sanford & Son Antiques in Tacoma, misled him about the potential value of the ticket." He knew what it was worth," Westby said. "He's in that business."
Last Week, Westby hired an attorney to start bringing legal action against Gorsuch in order to get some of the profit.
CP at 102.
When Westby heard the news on TV, shock turned quickly to anger.
"I thought he did right by me," Westby said. "When I saw that, I thought, `Boy, I just really got taken." (sic)
Adding insult to injury, Westby said, was Gorsuch's promise to donate $10,000 from the ticket sale to the nonprofit group Citizens for a Healthy Bay.
"My God, why couldn't he give me 10 percent?" he said. "He should have been fair and square."
CP at 103.
[2] Westby testified as follows:

Well, it was based on probably what hewhen he looked at it and, you knowand I just thought maybe if the ticket wasn't worth too much, I could get at least something out of it, so Ithat's why I asked for 1,000 for both.
IV RP at 108.
[3] Gorsuch argues that under Boonstra, Westby had to show that Gorsuch withheld material facts that would disprove his representations. We do not read Boonstra so narrowly. Although the defendant in Boonstra withheld material facts from the plaintiff and the court stated that his act of keeping the plaintiff "in ignorance of the true situation" justified the plaintiff's reliance, the court did not say that only this circumstance would justify reliance. 64 Wash.2d at 625, 393 P.2d 287.
[4] The Gorsuchs quote extensively from Alexander Myers & Co. v. Hopke, 88 Wash.2d 449, 565 P.2d 80 (1977), to support their assertion that Westby had to exercise due diligence. The Gorsuchs fail to acknowledge that they are quoting from the dissent in this case. See Alexander Myers & Co., 88 Wash.2d at 466-67, 565 P.2d 80.