Submitted on briefs November 2, 1950, reversed with directions
February 14, petition for rehearing denied March 14, 1951

## WEISS and HAMILTON *v.* GUMBERT

227 P. 2d 812
228 P. 2d 800

*S. J. Bischoff* and *George W. Mead,* of Portland, for appellants.

*Coan, Rosenberg & Swire,* of Portland, for respondent.

TOOZE, J.

This is an action of assumpsit brought by plaintiffs David M. Weiss and Ed Hamilton against defendant Eva B. Gumbert, individually and as executrix of the estate of Milton L. Gumbert, deceased, to recover the sum of $10,000. The case was tried to the court without a jury. Findings of fact, conclusions of law, and judgment were entered in favor of defendant. Plaintiffs appeal.

Milton L. Gumbert, in his lifetime, was the owner and operator of a retail fur business in Portland under the name of "Milton L. Gumbert Furriers" and of another retail fur business in Vancouver, Washington. He died testate January 12, 1944, and his last will and testament was duly admitted to probate in the probate department of the circuit court for Multnomah county on January 18, 1944.

By the said will the United States National Bank of Portland (Oregon) was nominated and appointed executor and decedent's widow, Eva B. Gumbert, as the coexecutrix of the estate, and the said bank alone, as trustee of the trust created thereby. The bank formally declined to accept appointment either as executor or trustee under the will, and no other trustee was appointed. On January 18, 1944, Eva B. Gumbert was appointed the sole executrix of the estate, and as such, continued the operation of the Portland store.

For many years immediately prior to and at the time of the transactions involved here, plaintiff David M. Weiss was engaged in the fur buying business throughout the nation with his headquarters in New

York City; and for some period of time immediately prior to the dealings which led up to the instant litigation, plaintiff Ed Hamilton was engaged in the retail fur business at Salem, Oregon.

In the late summer of 1946, Hamilton requested one Albert T. Bullier, a realtor of Portland, to make inquiry of defendant whether she would consider selling the Gumbert Portland store, which he did. Also about the same time, plaintiff Weiss wrote to defendant directly, making similar inquiry. At the time, defendant informed them she was not interested in selling.

In early 1947, defendant decided to sell the Portland store and employed Bullier as her agent to make the sale. Bullier immediately contacted Hamilton as a prospective purchaser, but was informed by Hamilton that he did not have the finances necessary to make the purchase. At Bullier's suggestion, Hamilton then contacted Weiss, who was interested.

Weiss arrived in Portland on Wednesday, March 26, 1947, for the purpose of looking into the matter. At or about that time, Weiss and Hamilton entered into an agreement between themselves, whereby it was understood that if Weiss was able to purchase the Gumbert store, then he and Hamilton would form a corporation to engage in operating retail fur stores, each to own one-half of the stock of the corporation. It was agreed between them that when Weiss completed the purchase of the Gumbert store, he would transfer it to such corporation in payment for his interest therein; Hamilton agreed to transfer his Salem store to the corporation for his stock therein, and in adjusting the difference in value between his store and that to be purchased by Weiss, he agreed to execute and deliver to Weiss his promissory note for $15,000.

On March 26, plaintiffs entered into negotiations with Bullier for the purchase by Weiss of the Portland store. As a part of these negotiations, plaintiffs requested that they be furnished a statement showing volume of sales and net profits of that store over a period of years. Bullier conveyed this request to defendant.

Late in the afternoon of March 26, after closing hours at the store, plaintiffs and Bullier went to the store to meet defendant. All the parties then went out to dinner together and after dinner returned to the store. Inasmuch as defendant was then planning on leaving for Sacramento the following Friday, she suggested to Weiss that he take an inventory of the stock, fixtures, and equipment on hand in the store that evening. Acting upon this suggestion, Weiss, assisted by one Julius Kruskal, a fur buyer for Weiss, and also by Hazel Olson and Warner Gumbert, employes of defendant, proceeded immediately to take such inventory. The work was not completed until midnight.

On March 27, negotiations were resumed in Bullier's office. At this meeting Bullier delivered to plaintiffs a typewritten statement which purported to show the volume of sales and net profits of the Portland store each year for the years 1939 to 1946, inclusive. This statement had been prepared by Hazel Olson, sister of defendant, who was employed by defendant as bookkeeper in the store, and was handed to Bullier by defendant.

This statement reflected a very profitable business. The defendant was asking $165,000 for the business, her price being based upon the actual inventory of stock, fixtures, and equipment, plus $85,000 for the good will. Inasmuch as the evidence here shows that the value of

the good will of a going business is arrived at by taking the average annual profit over a substantial period of time, a knowledge of what these profits were is very material in determining what may be a reasonable price to be paid for such business, including the good will.

The inventory taken by Weiss disclosed stock, fixtures, and equipment of less value than that fixed by defendant, which led to further negotiations respecting the price to be paid for the business, in which negotiations defendant personally took a part. A sales price of $153,938 was finally agreed upon. Relying upon the accuracy of the statement furnished him and subject to an examination of the books of the Portland store by his own auditor, Weiss agreed to make an offer for the business for the price agreed upon. However, Weiss explained to Bullier that he did not want his identity with a Portland retail fur business to be known just at that time, owing to the fact that he was then engaged in representing various retail stores as their New York buyer. It was then agreed that the Weiss offer to the estate should be made in the name of plaintiff Hamilton.

In passing, it might be noted that the evidence establishes beyond any peradventure of doubt that in the purchase of this Gumbert store the plaintiff Weiss was the real party in interest; he, and he alone, was the purchaser. Hamilton was the agent of Weiss for the purpose of making the offer, and for no other purpose; and, as shall later appear from quoted testimony of the defendant, this fact was known to her, as well as to her agent Bullier.

■ We are not unmindful of the fact that the trial court made findings of fact to the effect that Hamilton and Weiss were acting together as principals in the

purchase of this business and found as a conclusion of law that they were joint adventurers in that connection; but after a careful examination and study of the entire record, we conclude there is no substantial competent evidence to support either the court's finding of fact or conclusion of law now being discussed.

Pursuant to the foregoing negotiations and understanding, on Friday, March 28, the following offer in duplicate was prepared by Weiss's attorney:

"Portland, Oregon
March 28, 1947

"Mrs. Eva B. Gumbert, Executrix
Estate of Milton L. Gumbert, Deceased,
Portland, Oregon

"Dear Mrs. Gumbert:

"This letter will confirm our oral understanding relative to the matter of the purchase by the undersigned of the merchandise inventory, goodwill, tradename, fixtures, supplies and equipment of the Milton L. Gumbert store located at 816 Southwest Morrison Street, Portland, Oregon, on the following basis:

"The purchase price is to be the sum of One Hundred Fifty Three Thousand Nine Hundred Thirty-Eight Dollars ($153,938.00), plus prepaid insurance premiums adjusted as of the date of closing of this transaction, less ninety per cent (90%) of the net cash invoice price of all merchandise sold by you on and after midnight, March 26, 1947, to date of closing.

"The sale price is to include all merchandise, goodwill, tradename, fixtures, supplies and equipment.

"It is understood that all obligations incurred by the business up to the date of the closing of this transaction and the delivery of the stock and merchandise and other equipment are to be paid in full

and discharged by yourself, and that you are to comply with the Oregon Bulk Sales Law in connection with this transaction.

"The terms of sale are cash upon the completion of the transaction and delivery of the premises, merchandise, fixtures, supplies and equipment and Ten Thousand Dollars ($10,000.00) is herewith handed you as a down payment to apply on the purchase price.

"It is understood and this offer is made upon the express condition that the undersigned are able to negotiate and conclude a satisfactory lease with the owner of the premises in which your store is located, and in the event that such a lease can not be concluded within thirty (30) days from this date then this offer is to be void and of no further effect and you are to forthwith return to the undersigned the Ten Thousand Dollars ($10,000.00) herewith handed you.

"*   *   *

"It is understood that this transaction will be concluded at the first possible opportunity and you agree to recommend and exert your influence to the end that the Court shall approve the consummation of this transaction.

"If the foregoing agreement is in accordance with your understanding will you kindly indicate your acknowledgement and acceptance thereof upon the duplicate original of this communication.

"Yours very truly,
/S/ ED HAMILTON

"The foregoing offer is hereby accepted this 28th day of March, 1947, subject to the approval of the Circuit Court of the State of Oregon for Multnomah County, Department of Probate.
/S/ EVA B. GUMBERT
Eva B. Gumbert"

This offer was signed by Hamilton as indicated and delivered to Bullier. At the same time, Weiss delivered to Bullier his personal check for $10,000, payable to the order of defendant as executrix. Bullier delivered the offer and check to defendant, and she signed the acceptance as noted above. Weiss then returned to New York.

Shortly thereafter, steps were taken to organize a corporation known as "Ed Hamilton Furs, Inc.," with Ed Hamilton as president, this being in accordance with the arrangement between Weiss and Hamilton. This corporation also entered into negotiations for a lease with the owner of the premises on which the Gumbert store was located, and on or about April 28, secured such a lease.

On Monday, April 21, one Julian C. Ruben, a certified public accountant of New York, arrived in Portland for the purpose of examining the books and other records of the Gumbert store on behalf of Weiss. He made his examination on April 22. He was furnished by defendant and her employes with all the books and records of the store that might throw light upon the volume of sales and net profits. On this examination, Ruben found substantial discrepancies between the figures on the statement originally furnished Weiss and those disclosed by the books and records of the store.

The following table shows such discrepancies as to profits:

| Year | Profits shown on statement | Profits shown on books—Ruben audit. |
|------|----------------------------|-------------------------------------|
| 1938 | Not given | $ 3,675.14 |
| 1939 | $ 30,235.00 | 3,386.38 |
| 1940 | 28,495.00 | 10,974.35 |
| 1941 | 43,200.00 | 16,735.84 |
| 1942 | 50,365.00 | 25,565.74 |

| Year | Profits shown on statement | Profits shown on books—Ruben audit. |
|---|---|---|
| 1943 | 190,399.00 | 139,681.55 |
| 1944 | 101,556.00 | 124,806.33 |
| 1945 | 47,346.00 | 47,346.70 |
| 1946 | 28,728.00 | 24,356.24 |
| | $520,324.00 | $396,528.27 |

The average annual profit as shown on the statement furnished Weiss is $65,000; as per Ruben's audit of the books, it is $44,000, or a difference of $21,000 per year. As pointed out previously, this is a substantial consideration in determining what should be paid for the good will of the business.

Ruben directed defendant's attention to the foregoing discrepancies. Because of the same, suggestion was made that the price set forth in the Weiss offer be reduced. Defendant finally agreed to such reduction in the sum of $5,000; whereupon Ruben assured her that despite the discrepancies, he would *recommend to Weiss* that the sale be completed at the reduced price. The defendant testified:

"A. * * * Mr. Ruben then came back and said *he would recommend a sale,* recommend the sale to go through. * * * And he immediately tried to reach Mr. Weiss over the telephone but was unable to do so * * *." (Italics ours.)

Testifying respecting her discussion with Ruben about the discrepancies, defendant said:

"Q. Now at any rate after this discussion someone—Mr. Ruben did say that *he would have to notify Mr. Weiss* — — —

"A. *That is right.*

"Q. — — — about what he had discovered?

"A. Naturally; *he came out for that purpose;* I presume so.

"Q. He came out for that purpose; is that your understanding?

"A. To check our books, so naturally — — —" (Italics ours.)

On April 22 and after defendant had agreed to reduce the price as stated, Bullier procured both copies of the original offer and with pen and ink struck out the words and figures "Fifty Three" and "($153 *)" and in their stead wrote the words and figures "Forty Eight" and "(148 *)," so that the price in the offer then read: "One Hundred Forty Eight Thousand Nine Hundred Thirty-Eight Dollars ($148,938.00)." On the margin opposite the alterations Bullier wrote "O. K." In the paragraph relating to the lease, Bullier changed the word and figures "thirty (30)" to read "Forty (40)" and on the margin opposite wrote "O. K." Opposite the letters "O. K." both Hamilton and defendant placed their initials.

There is a dispute between the parties whether the initialing was done on April 22, when Bullier made the alterations, or the next day. Hamilton testified the initials were placed there at the time Bullier made the changes on April 22; and that at the time he affixed his initials, he stated that he did so subject to the approval of Weiss. Both Ruben and Bullier corroborated Hamilton as to the time the changes were initialed. Bullier testified:

"A. I think I said April 22nd. That was my impression that it was the 22nd.

"Q. I beg your pardon, you are right; April 22nd. That was the day that Mr. Ruben discovered the discrepancies; am I not correct in that, Mr. Bullier?

"A. Well, if I remember correctly from the dates that you have given me and that I have understood, why, Mr. Ruben came into town on the 21st

of April and he made his auditing work—he did he [sic] auditing work during the 22nd, and I believe it was that evening that the offer was initialed and the changes—the change from a hundred fifty-three to a hundred forty-eight thousand and some odd dollars was made.''

Defendant contends that the initialing was done on April 23, though Bullier made the changes on the 22nd. In any event, all parties understood that *the changes were subject to the approval of Weiss.* That defendant so understood it is established conclusively by her own testimony. In explaining why the change was made to read forty (40) days, instead of thirty (30) days, defendant testified:

''A. * * * I think Mr. Bullier was the one that told me they would have to have a time extension because on the 28th, the expiration of it, they would be over that, and Mr. Ruben was going to Salem with Mr. Hamilton, he would leave on a Thursday by plane, and he would not return to New York until Friday, and Friday, Saturday and Sunday would be lost, *he couldn't go to the bank to make this recommendation nor could he see Mr. Weiss, and then Monday being the 28th* would be the day that the contract would be over with, so it was necessary I thought for—therefore the time was granted, the extra ten days.

''Q. When was that agreed to?

''A. At the time that we affixed our initials on April 23rd about two thirty or around there * * *.''
(Italics ours.)

And in support of her contention that the initialing was accomplished on April 23, instead of April 22, defendant testified:

''Q. But you say that nobody initialed it at that time? [April 22 when Bullier made alterations.]

''A. Not at that time. *We couldn't have; the*

*approval had not come from Mr. Weiss.* (Italics ours.)

■ There is no evidence whatever in the record that Weiss at any time, either by word or act, personally approved the changes made in the original offer or waived any rights he may have had, owing to the misrepresentations as to profits of the store appearing in the original statement. Neither is there any substantial competent evidence in the record that Weiss at any time, either by word or act, personally authorized either Hamilton or Ruben to speak for him in the respects under discussion. Defendant knew that neither Hamilton nor Ruben had such authority as evidenced by her statement above quoted respecting "the approval * * * from Mr. Weiss" and her further testimony that "Ruben would *recommend* to Mr. Weiss" that the sale go through.

On or about April 28, Ruben delivered to Weiss in New York the figures he had taken from the Gumbert store books. On May 5, Weiss wired George Mead, his Portland attorney, as follows:

"Because sales and profits of Gumberts were found after audit not to equal amount originally submitted have been unable to secure necessary financing which had been promised to me on basis of original figures. Sorry but have no alternative but to rescind transaction. Please advise landlord and obtain refund of deposit—David M. Weiss."

Mead immediately brought this wire to the attention of defendant and Bullier. On May 14, Mead also wrote defendant, withdrawing the original offer of March 28 for the reasons: "(a) false representations were made with respect to the net profits of the business, and (b) the offer has not been accepted by anyone qualified to accept the same and to make it a binding

contract between the parties," and demanded the return of the $10,000 paid down by Weiss. Defendant refused to return the money, and the instant action was commenced for its recovery.

Upon the trial, defendant offered testimony in an effort to explain away the very substantial discrepancies as to profits heretofore discussed. Without going into the testimony in detail, suffice to say that most of the explanation offered referred to matters *not appearing in the books of the Gumbert store* and depended largely upon mere conjecture. For example, it was contended that between the years 1939 and 1942, there were occasions when the Portland store would purchase merchandise and then transfer it to the Vancouver store without any entry thereof being made on the books. This testimony was offered by Hazel Olson, who, during those years, did not have any connection with either store. Further, it was claimed that the salary allowed and paid Mr. Gumbert during his lifetime as manager and that paid defendant as manager during the time she managed the business as executrix should be considered as "profit," instead of being an expense of operation. On the books these salaries appear as expense items. But giving these explanations full face value, there yet remained substantial discrepancies between the profits as represented and the profits in the light of the explanations. On May 8, 1947, after Weiss had rescinded, the witness Hazel Olson prepared a corrected statement of the profits in accordance with her explanations.

This corrected statement was admitted in evidence. Let us compare the figures appearing thereon with those set forth in the original statement furnished plaintiffs.

| Year | Original statement | Corrected statement of May 8 of profits |
|------|-------------------|------------------------------------------|
| 1939 | $ 30,235.00 | $ 8,186.38 |
| 1940 | 28,495.00 | 15,774.35 |
| 1941 | 43,200.00 | 21,735.84 |
| 1942 | 50,365.00 | 30,365.74 |
| 1943 | 190,399.00 | 150,399.73 |
| 1944 | 101,556.00 | 113,056.31 |
| 1945 | 47,346.00 | 59,346.70 |
| 1946 | 28,728.00 | Not determined |

We do not subscribe to the theory of defendant that the salary paid defendant as manager while operating the business as executrix of the estate should be treated as "profit"; this salary was properly charged on the books as an expense of operation. In her corrected statement of May 8, the witness Olson included the amounts of salary paid as profits.

■ But aside from all that, we hold that in so far as a right to rescind on the part of Weiss is concerned, his right is to be determined as of the time the Ruben audit was made and what the books and records of the Gumbert store then disclosed, and is not dependent upon later explanations outside those records.

As we pointed out previously, the finding of the trial court that the plaintiffs were joint adventurers in the purchase of the Gumbert store is not supported by any substantial competent evidence. Even in that finding the court stated "and Plaintiff Weiss was required to contribute the cash necessary to complete the purchase of said fur store from Defendant."

The joint adventure, if there was such, was in the new business to be later conducted when Weiss secured and delivered the Gumbert store, and Hamilton transferred his own store to the new corporation for the

purposes of the new operation. Under their agreement the obligations of both Weiss and Hamilton were separate and distinct. Many of the other findings of the trial court are based upon the premise that plaintiffs were joint adventurers. The premise being wrong, the findings based thereon are wrong.

■ We recognize the rule of law that in an action such as this the findings of the trial court are entitled to the same weight accorded a verdict of a jury, and that this court is bound thereby if there is any substantial competent evidence in the record to support them; and what we have said respecting the relationship existing between plaintiffs in so far as the purchase of the Gumbert store is concerned is with that rule in mind.

The trial court made a finding that defendant "did not either intentionally, recklessly, negligently or otherwise make any false or fraudulent representations to plaintiffs regarding the gross volume and net profits of said fur store for the years 1939 to 1946."

In this finding it is quite evident that the trial court had in mind false representations that would form the basis of actionable fraud. As to the elements necessary to constitute actionable fraud see *Conzelmann et al. v. Northwest Poultry & Dairy Products Co. et al.*, 190 Or. 332, 225 P. 2d 757; 37 C. J. S., Fraud, 215, § 3.

■ It may be assumed that defendant was not guilty of actionable fraud. But the evidence is conclusive that the statement furnished plaintiffs before the original offer was made contained misstatements respecting the profits of the Gumbert store during the years 1939 to 1946, inclusive. These misstatements referred to material matters and were relied upon by plaintiffs. It may be conceded that in making the mis-

statements defendant was entirely innocent; she may have had no intention whatever to mislead and deceive plaintiffs; she may have honestly believed the figures set forth to be true. Yet, withal, upon discovering the truth after Ruben's audit, Weiss had the right to rescind the transaction, provided he acted promptly, and he did.

In Restatement, Contracts, 908, § 476, the rule is stated:

"(1) Where a party is induced to enter into a transaction with another party that he was under no duty to enter into by means of the latter's fraud or *material misrepresentation,* the transaction is voidable as against the latter and all who stand in no better position \* \* \*.

"(2) Where a transaction is voidable because of *a misrepresentation innocently made* and the facts become in accordance with the representation before notification by the deceived party of an intent to avoid the transaction, it is no longer voidable." (Italics ours.)

In comment b. on the foregoing statement we find:

"b. *Innocent material misrepresentation though not accompanied by negligence has the same effect as fraud in rendering a contract or discharge voidable.*" (Italics ours.)

In *Sharkey v. Burlingame Co.,* 131 Or. 185, 197, 282 P. 546, this court said:

"Rescission is often granted in cases where an action for deceit could not be maintained. The *right of rescission* does not, as the right to recover damages in a common law action for deceit, *depend upon fraud,* for if the transaction was the result of a false representation of a material fact it cannot stand against the injured party's right to rescind, however honestly made." (Italics ours.)

See also 17 C. J. S., Contracts, 502, § 147.

Defendant argues that inasmuch as the original offer did not disclose on its face that Hamilton was acting merely as an agent for Weiss, parol evidence was inadmissible to establish that fact. Authorities are cited to that effect. But an examination of the authorities will disclose that the parol evidence rule is applicable only to one who contracts in his own name but claims that he is not personally liable on the contract because he acted for an undisclosed principal. The *agent only* is precluded by the rule from avoiding his primary liability on the contract.

The rule as applicable to the case at bar is that stated in *Pennick et al. v. American National Bank,* 126 Or. 615, 618, 268 P. 1012, as follows:

> "There is conflict in the authorities regarding the admissibility of evidence offered for the purpose of showing that a party to the written contract is not the real party in interest but was acting for a principal at the time he entered into and signed the contract. This state, however, early adopted the principle that parol evidence was admissible to show that a party not named in nor a subscriber to a contract is the real party in interest and is bound thereby. This principle was first announced in Barbre v. Goodale, 28 Or. 470 (43 Pac. 378)."

In *Barbre v. Goodale,* supra at page 471, in discussing the rule the late Mr. Justice WOLVERTON said:

> "The principal may have recourse to the same doctrine to bind the party thus entering into contract with his agent."

See also 3 C.J.S., Agency, 208, § 275; 2 Am. Jur., Agency, 313, § 400.

It is unnecessary to discuss what the effect might have been respecting this transaction had Hamilton and Weiss been joint adventurers in the purchase of the

Gumbert store. Many of the authorities cited and discussed in the briefs of the parties and much of the argument refer to joint adventures and the effects thereof as concerns dealings between one or more of the joint adventurers and third persons. To discuss these authorities and point out their inapplicability to the issues here would unnecessarily prolong this opinion.

We have given careful consideration to the extensive argument appearing in the respective briefs of the parties and to the authorities cited respecting the construction that should be given the last will and testament of the testator in determining the extent of defendant's authority thereunder, but we do not deem it necessary to go into those matters in this opinion.

■ The effect of altering the original offer would be to create a new agreement between the parties in the event such changes were approved by Weiss. Had he approved the same, the rule announced in *Anderson v. Laws,* 176 Or. 468, 159 P. 2d 201, and reaffirmed in *Conzelmann et al. v. Northwest Poultry & Dairy Products Co. et al.,* supra, would, as contended by defendant, be applicable, viz.:

> "When one who has been induced by fraud to enter into a contract, subsequently, with knowledge of the fraud, enters into another agreement respecting the same transaction with the one guilty of the fraud, he, the injured party, thereby waives and relinquishes all right to damages on account of such fraud."

■ Under the foregoing rule, had Weiss entered into the new agreement, he would thereby have been precluded from exercising his right of rescission based upon the original misrepresentations. But, as pointed

out, Weiss did not give his approval to the alterations; therefore, the rule is not applicable.

Even if we assume that Hamilton was in fact a principal, rather than an agent, in the transaction, the result would be the same. Though Hamilton initialed the changes and thereby expressed his own approval of the same, nevertheless, such alterations were made subject to Weiss' approval. Therefore, this required approval by Weiss became a condition precedent to the formation of a new contract between the parties. Obviously then, there could be no new agreement respecting the same transaction and binding upon anyone until such approval was given. The approval not having been given, the transaction did not ripen into a new contract; hence the rule announced in *Anderson v. Laws,* supra, would not apply to Hamilton. Hamilton, on his own account therefore had the right to rescind, and he exercised that right on May 6, 1947, in a letter addressed to defendant.

Having been well within their rights in rescinding the transaction, the plaintiffs were entitled to a return of the original deposit of $10,000.

The judgment of the trial court is reversed, and this cause is remanded with directions to the court to enter judgment in favor of plaintiffs and against defendant, as executrix of the estate of Milton L. Gumbert, deceased, for the sum of $10,000, with interest thereon at the rate of 6% per annum from May 15, 1947, until paid. ·

### On Rehearing

*S. J. Bischoff* and *George W. Mead,* of Portland, contra.

*Coan, Rosenberg & Swire,* of Portland, for the petition.

TOOZE, J.

On Petition for Rehearing.

On appeal herein, this court reversed the trial court and remanded the cause with directions to the court to enter judgment for plaintiffs David M. Weiss and Ed Hamilton against defendant Eva M. Gumbert, as executrix of the estate of Milton L. Gumbert, deceased, in the sum of $10,000, *with interest thereon* at the rate of 6 per cent per annum *from May 15, 1947,* until paid. *Weiss and Hamilton v. Gumbert,* 52 Or. Ad. Sh., 221.

Defendant has filed a petition for rehearing alleging this court erred in holding that plaintiffs were entitled to recover interest, claiming such holding is contrary to the previous decisions of the court in *Copeland v. Tweedle,* 61 Or. 303, 122 P. 302, and *Boyer et al. v. Edgemont Investment Co.,* 135 Or. 161, 295 P. 471.

The principal sum of $10,000 involved herein represented a deposit made by plaintiffs on March 28, 1947, as a part of a written offer of purchase of the Gumbert fur store located in Portland.

Plaintiffs rescinded this offer on May 14, 1947, and on that day demanded in writing a return of the deposit. Defendant refused to return the money, and this action was commenced by plaintiffs to recover the same, with interest thereon at the rate of 6 per cent per annum from May 15, 1947.

On the appeal to this court, we held that plaintiffs had the right to rescind the transaction and were entitled, upon such rescission, to a return of their deposit of $10,000.

Section 66-101, O.C.L.A. (as amended by Or. Laws, 1917, ch. 358, § 1) in part provides:

"The rate of interest in this state shall be six per centum per annum and no more, and shall be payable in the following cases, to wit:

"(1) *On all moneys after the same becomes due;* provided, that open accounts shall bear interest from the date of the last item thereof.

"(2) On judgments and decrees for the payment of money from the date of the entry thereof unless some other date is specified in said judgment or decree." (Italics ours.)

In *Copeland v. Tweedle,* supra, it appears that plaintiff had taken a conveyance from defendants of certain timber land in Clatsop county, paying therefor $3,900. She rescinded on the ground of fraud and demanded a return of the $3,900, tendering defendants a deed of reconveyance. The trial court found for plaintiff and entered a decree canceling the conveyance from defendants and allowing a recovery by plaintiff of the sum of $3,900, with interest at the rate of 6 per cent per annum *from the date of the original conveyance.* On appeal to this court, we held that "prior to decree, the case presents no situation allowing interest within the meaning of § 6028, L.O.L." This decision was rendered in March, 1912.

Section 6028, L. O. L., in part provided:

"The rate of interest in this state shall be six per centum per annum, and no more, on all moneys after the same becomes due; on judgments and decrees for the payment of money; on money received to the use of another and retained * * * ."

In *Sargent v. American Bank and Trust Co.,* 80 Or. 16, 40, 154 P. 759, 156 P. 431, Mr. Justice HARRIS,

on rehearing, traced the history of this interest statute and discovered that in the original draft of the act as filed in the office of the Secretary of State there was a comma (,) instead of a semicolon (;) after the words "on all moneys after the same becomes due," thereby clearly indicating that the words "on all moneys after the same becomes due" referred to moneys becoming due "on judgments and decrees."

Because of this, *Copeland v. Tweedle* was correctly decided. But in 1917, following the decision in *Sargent v. American Bank and Trust Co.*, supra, the legislature amended this statute as above noted.

In April, 1923, the statute as amended again came before this court for consideration. In *Gellert v. Bank of California, National Association, et al.*, 107 Or. 162, 178, 214 P. 377, it was contended that when the right to recover money is in good faith denied, interest will not be allowed on the demand prior to liquidation by judgment. In rejecting this contention, Mr. Justice HARRIS, speaking for the court, said:

"The amount for which the plaintiff sued was a definite and certain sum. The plaintiff was entitled to recover either the whole amount of each draft or nothing. The amount became due before judgment. By the plain terms of Section 7988, Or. L., as it now reads after amendment, interest 'shall be payable * * * on all moneys after same becomes due.' Interest was properly included in the judgment."

In the Gellert case, plaintiff had tendered the drafts to the bank for cancellation and demanded a return of the money paid for them on June 2, 1920. The judgment in favor of plaintiff included interest from June 2, 1920, the date of the demand and defendant's refusal to pay.

In the case at bar, the $10,000 deposit involved was a fixed and definite sum, and plaintiffs were entitled to recover the whole of such sum or nothing at all. It became due when plaintiffs demanded payment thereof from defendant, and under the plain provisions of § 66-101, O.C.L.A., plaintiffs were entitled to interest from that date.

In the case of *Boyer et al. v. Edgemont Investment Co.*, 135 Or. 161, 168, 295 P. 471, decided in January, 1931, plaintiff brought suit to rescind a contract for the purchase of certain real property in Portland and to recover the amounts of money paid thereon. Plaintiff was awarded a decree and was allowed interest on the several amounts paid from the dates of the respective payments. On appeal, defendant contended that such allowance of interest was erroneous. This court disposed of the matter by simply stating: "Interest should have been allowed *from the date of the decree only: Copeland v. Tweedle,* 61 Or. 303, 309 (122 P. 302); Oregon Code 1930, § 57-1201; Or. L., § 7988." (Italics ours.)

As heretofore noted, the case cited as authority for the above quoted sentence, viz., *Copeland v. Tweedle,* was decided before the amendment of 1917, and hence does not support the ruling made by the court. In the respects now under discussion, the statement of the court in *Boyer et al. v. Edgemont Investment Co.,* supra, is expressly overruled.

In the instant case, the trial court should have rendered judgment in favor of the plaintiffs for the sum of $10,000, with interest thereon at the rate of 6 per cent per annum from the date it became due, instead of entering judgment for defendant as it did.

■  Under Or. Const. Art. VII, § 3, this court is empowered to direct the entry of judgment heretofore ordered. See exhaustive opinion of Mr. Chief Justice BRAND in *Gow v. Multnomah Hotel, Inc.,* on motion filed for recall and modification of mandate, dated March 7, 1951.

The petition for rehearing is denied.