247 F.2d 723
 Mike H. KOSTELAC and Maryland Casualty Company, a corporation, Appellants,
v.
UNITED STATES of America, Appellee.
UNITED STATES of America, Appellant,
v.
Mike H. KOSTELAC and Maryland Casualty Company, a corporation, Appellees.
 No. 15343.
 United States Court of Appeals Ninth Circuit.
 June 28, 1957.
 Order Amending Opinion and Judgment September 3, 1957.
 
 COPYRIGHT MATERIAL OMITTED Eisenhower, Hunter, Ramsdell & Duncan, Tacoma, Wash., E. H. Tenney, Jr., Tenney, Dahman & Smith, St. Louis, Mo., for appellants.
 George C. Doub, Asst. Atty. Gen., John G. Laughlin, Paul A. Sweeney, Attorneys, Department of Justice, Washington, D. C., Charles P. Moriarty, U. S. Atty., Seattle, Wash., for appellee.
 Before DENMAN, Chief Judge, and BONE and POPE, Circuit Judges.
 DENMAN, Chief Judge.
 
 
 1
 These are appeals by both plaintiff, United States, and by defendants, Mike Kostelac and his surety, the Maryland Casualty Company, from a judgment of the district court for the western District of Washington, Southern Division, awarding $30,716.18 to the United States in its action against defendants for breach of contract to purchase garbage, or food waste, for hog feed.
 
 
 2
 Most of the facts are stipulated. Prior to June, 1946, Kostelac, who was experienced in the hog raising business, and who had previously purchased food waste from military installations as hog feed, requested the contracting officer at Fort Lewis, Washington, to place his name on a roster of bidders for a contract to haul food waste or garbage from the mess halls at that base. Subsequently bids were invited by the Fort Lewis authorities on a five-year contract to buy garbage, the contract price to be based on the per man per day production of waste — that is, the amount owed by the contractor was to be determined by multiplying a price rate by the number of men fed in the mess halls, rather than according to the weight of the garbage collected. It appears that this system of determining the quantity was novel, and that its purpose was to eliminate the necessity of weighing the garbage collected each day. The Army contracting officer urged bidders to inspect the garbage containers prior to bidding and it appears that Kostelac very carefully did so. On the basis of his examination and of the representation made in good faith by the contracting officer that the quantity of garbage he observed in the containers was a one-day accumulation. Kostelac estimated the quantity of waste produced per man per day and made a bid which was accepted by the Army.
 
 
 3
 Thereafter Kostelac began collecting the garbage and discovered that what he had seen in the containers was a two-day rather than a one-day accumulation. On July 10, Kostelac advised Sixth Army Headquarters of the mistake that had been made in estimating the amount of garbage produced per man per day. In the words of the pretrial order in which the parties stipulated most of the material facts, Kostelac thereafter "persistently pursued efforts to have the Government modify, adjust, or cancel his said contract, addressing his communications in that respect to both the military and congressional authorities, and during which time, on or about July 24, 1946, defendant Kostelac undertook renegotiation of his contract with the Contracting Officer at a reduced sliding scale submitted by him, which renegotiation was subject to its approval by the Headquarters Sixth Army; that, however, upon referral of the same to said Headquarters, on or about August 2, 1946, it was the determination of said Headquarters that, upon acceptance by the Contracting Officer of said contract, certain rights accrued to the Government of the United States, that the War Department was without authority to release these rights, and that accordingly said contract would be enforced in accordance with the provisions thereof."
 
 
 4
 Kostelac, while continuing his efforts for renegotiation, picked up garbage at the Fort until December 15, 1946, without paying therefor. On that date a substitute contract with another party went into effect for the remainder of the contract period.
 
 
 5
 Thereafter the Government began this action to recover the contract price of the garbage which Kostelac received, and damages in the amount of the difference between the price of the garbage for the remainder of the contract period (4½ years) under the contract with Kostelac, and the lower price for the garbage during this period under the substitute contract. The district court gave judgment for the United States for the contract price of the garbage which Kostelac collected, but denied damages for the remainder of the contract period "under the peculiar circumstances of this case."
 
 
 6
 It is apparent that this decision is inconsistent: (1) if the contract is valid, the United States was entitled not only to the contract price for the garbage which Kostelac took, but to compensation for loss incurred by reason of failure to pick up garbage after December 15, 1956; (2) if Kostelac is entitled to rescission he is liable only for the fair value of the garbage which he actually obtained.
 
 
 7
 The first question to be decided is whether the mistake was such as to entitle Kostelac to rescind the contract upon its discovery. The district court found that there was "no question but that Kostelac made an error * * * when he prepared his bid," but concluded that it was unnecessary to decide whether Kostelac ever had such a right, because, if he did, he had waived it.
 
 
 8
 However, this question is not only material, it is the first question which must be decided. Since substantially all of the facts concerning the contract, the negotiations after the mistake was discovered, and Kostelac's default were stipulated in the pretrial order,[1] the question before this court would be whether the trial court's finding on this point was supported by the record,[2] if the trial court had made a finding. Since the court has made no finding and since the evidence on this question is written, as it was before the trial court, it is proper for this court from such undisputed written evidence to decide whether Kostelac was entitled to rescind the contract because of the mistake as to the quantity of garbage produced per man per day at the base.[3]
 
 
 9
 The trial court found that a mistake had been made and it is not contended here that the mistake was not material. The error was basic to the contract, since it resulted in giving Kostelac the impression that under the contract the unit for measuring the quantity of food waste consisted of twice the accumulation of waste that it was subsequently found to contain.[4] This error clearly resulted from Kostelac's reliance upon the statement of the Army contracting officer who in good faith told him that the amount of waste in the containers which Kostelac inspected was only a one day's accumulation when, in fact, it was an accumulation of two days' waste. Hence Kostelac assumed that the number of men then at the Fort produced daily twice the amount of waste they actually produced, and his bid on the per man per day basis of the contract was founded upon the assumption that the per man per day rate of garbage production was double what it was in fact. Kostelac's error so induced by the Government's representative is clearly a material mistake. See Rest. Contracts § 500.
 
 
 10
 The next question is whether this material mistake entitled Kostelac to rescission. There is substantial authority for the proposition that "rescission may be had on account of innocent misrepresentations of material facts on which the party seeking relief relied to his detriment."[5] There can be no doubt that Kostelac relied on this misrepresentation in making his bid. The district court impliedly so found when it rested its denial of relief to Kostelac solely on the ground that he had waived his right to rescind.
 
 
 11
 Under the above quoted principle Kostelac is entitled to rescind the contract unless, as the Government contends, other facts appear which prevent its application to this case.
 
 
 12
 First, the Government contends that under the terms of the contract Kostelac assumed the risk of the mistake which was made. This argument rests on the part of Article I of the written contract which provided that the contract was "in no sense conditioned on * * * the amount of waste collected."
 
 
 13
 The purpose of this provision was to make explicit the refusal of the United States to guarantee that a minimum number of men would be stationed at the Fort; it was not designed to deny relief to a contractor whose estimate of the per man production of food waste was based on incorrect information given him by the military authorities. The contention of the Government that this provision should prevent relief from an error which led Kostelac to understand that the contract unit (per man per day production of food waste) for measuring the amount of food waste he obtained consisted of twice the quantity of garbage which it was later found in fact to contain is patently without merit.
 
 
 14
 Secondly, the Government argues that the above quoted clause is to be treated like the familiar "as is, where is" clause of government contracts under which the government expressly makes no warranties concerning the property sold.[6] These cases are clearly inapposite. Kostelac inspected kitchen waste at the Fort to determine how much waste was produced per man per day, since the contract price was based on this unit of measurement. The quantity of waste he inspected could be used to calculate the per man per day rate of production only if he knew how many days' accumulation he was inspecting. The responsible army official led him to believe that this quantity was produced in one-half the time in which it was actually produced. In a word, Kostelac thought the waste he was inspecting represented something it did not in fact represent. Such an error is in no way comparable to that assumed by the bidder under an "as is, where is" clause; rather it is essentially an error induced by the Government as to the subject matter of the contract itself.
 
 
 15
 The final provision of the contract which the Government urges precludes granting relief to Kostelac for his mistake is the statement in the invitation to bid that the per man per day production of waste was .04 pounds. The Government argues that this figure is binding on the parties and conclusively establishes as a matter of law that it was on the basis of this rate of production that Kostelac bid.
 
 
 16
 The first difficulty with this contention is that this "official estimate" of the rate of production of waste is that it was ridiculously small: it meant that the production of waste was two-thirds of an ounce per day per man — less than the weight of a potato peel! Kostelac testified without contradiction that no one took this "estimate" seriously and that the contracting officer said he didn't know "what it was there for," but that the officials told him that this figure was required to be in the invitation to bid although "they didn't know why." Kostelac said the figure appeared in all the previous garbage contracts on which he had bid, and that it was always ignored.[7]
 
 
 17
 A stronger reason for ignoring this inexplicable provision is the fact that if this estimate were to be taken as conclusive on the parties there would have been no purpose in the government's urging bidders to inspect the garbage containers before bidding, because the principal purpose for their so doing was, as explained above to determine the per man per day rate of production of waste.
 
 
 18
 That the trial court properly disregarded this provision is shown by its resting its decision, not on any provision of the contract, but on Kostelac's alleged waiver of his right to rescind.
 
 
 19
 The Government contends that, assuming the error was material, it resulted from Kostelac's negligence and that he is precluded from rescinding therefor. The district court apparently made no finding as to Kostelac's alleged negligence. In the pretrial order, however, it was stipulated that the Army contracting officer had informed Kostelac that the waste in the containers represented a one day's accumulation. Kostelac was clearly entitled to rely on this representation of the responsible government official.[8] Further, the district court's statement that if Kostelac had promptly asserted his right to rescind, he "might well have been" entitled to rescission, is inconsistent with assertion here by the Government that the error resulted from his negligence.
 
 
 20
 The next question is whether, as the district court found, Kostelac, subsequent to his discovery of the error, waived his right to rescind therefor. As was conceded by the Government in the above quoted portion of the pretrial order, Kostelac immediately upon discovery of the error began and "persistently pursued efforts to have the government modify, adjust or cancel his contract." (Emphasis added.) Yet the trial court concluded that he "did not demand either rescission or reformation." It is difficult to conceive the theory on which the district court reached this conclusion, which is apparently contrary to the stipulation of the parties, unless it was the court's view that as a matter of law Kostelac's efforts to obtain renegotation of the contract constituted an election not to demand rescission. This rule appears to produce a most inequitable result, for the record shows that Kostelac's efforts for renegotiation were encouraged by the government. It would appear that as a matter of policy the law ought to encourage the parties to reach amicable settlements of disputes of this kind, and that a rule of law which penalizes a party who seeks such a settlement by depriving him of his right to rescind is both harsh and contrary to sound policy. We find no authority to support the rule invoked by the trial court.
 
 
 21
 The judgment is reversed, the contract is deemed rescinded and the case remanded to the district court to find the reasonable value of the food collected by Kostelac and render judgment to the United States therefor.
 
 
 22
 Order Amending Opinion and Judgment.
 
 
 
 Notes:
 
 
 [1]
 Orvis v. Higgins, 2 Cir., 1950, 180 F.2d 537, 539, held that if evidence on a question of fact before the district court is entirely written, an appellate court is as able to weigh that evidence as is the trial court
 
 
 [2]
 Rollingwood Corp. v. C. I. R., 9 Cir., 1951, 190 F.2d 263, 265
 
 
 [3]
 Under the rule of Orvis v. Higgins, note 1, supra, it appears a fortiori that this court may make a finding of fact based on uncontroverted written evidence where the trial court omitted so to do
 
 
 [4]
 An indication of the gravity of the error appears from Kostelac's uncontroverted testimony that as a result of the error he was required to pay $20 per ton for the garbage under the contract when he had estimated the top price as $8-$10 per ton
 
 
 [5]
 Lockwood v. Christakos, 1950, 86 U.S. App.D.C. 323, 181 F.2d 805, 807. Williston, Contracts § 1500 (Rev. ed. Williston & Thompson 1937); Rest. Contracts § 476
 The innocent misrepresentation here resembles closely a misrepresentation concerning the productivity of a business made by a seller to a buyer. It is well established that such a misrepresentation is material, and may entitle the purchaser to relief. 27 A.L.R.2d 14 ff. Weiss and Hamilton v. Gumbert, 1951, 191 Or. 119, 227 P.2d 812, 228 P.2d 800.
 
 
 [6]
 See, e. g., Maguire & Co. v. United States, 1927, 273 U.S. 67, 47 S.Ct. 274, 71 L.Ed. 540; United States v. Hathaway, 9 Cir., 1957, 242 F.2d 897
 
 
 [7]
 The presence of such terms is common in so-called "adhesion" contracts in which one party in the stronger bargaining position provides the form of the contract which may contain many terms which are not in any sense bargained for between the parties, but are imposed upon the weaker by the dominant party. See, e. g., Ehrenzweig, Adhesion Contracts in Conflict of Laws, 53 Col.L.Rev. 1072, 1075 (1953)
 
 
 [8]
 The decision of this court in Rosenberg Bros. v. Commodity Credit Corp., 9 Cir., 243 F.2d 504, cited by the government is clearly inapposite. In that case the alleged misrepresentation of the government agency on which Rosenberg relied purported to restrict the power of the agency to adjust its future purchasing program to changing conditions. We held that the agency, which was charged by statute with the duty of stabilizing agricultural commodity prices, lacked the power to bind itself to a future course of conduct, and that the company dealing with the agency was presumed to know of these limitations on the agency's power
 
 
 
 23
 DENMAN, Circuit Judge.
 
 
 24
 It is ordered that the last paragraph of our opinion be stricken and the following substituted therefor:
 
 
 25
 It is unquestioned that Kostelac fed the garbage to his swine at his hog ranch at Gig Harbor, Washington, several weeks until the swine were sold. Thereafter, having no swine he dumped the garbage, now valueless to him, nearer to Fort Lewis, intending to secure a nearby ranch upon the making of a new contract.
 
 
 26
 The remaining question is — Whether the government is entitled to recover anything for the hog food which Kostelac continued to haul from Fort Lewis during the period in which he was attempting to have the government modify, adjust, or cancel the contract which Kostelac entered into on the government's misrepresentation of the facts.
 
 
 27
 It is clear that the sole cause of this litigation is the government's false representation as to the quantity of hog food then being produced at Fort Lewis. The wrongful effect on Kostelac is none the less because the misrepresentation was not in bad faith. No case could more require the application of the rule stated in the Restatement of Restitution, Section 155, p. 611, as follows:
 
 
 28
 "Non-Tortious Recipient Not More At Fault than Claimant.
 
 
 29
 "(1) Where a person is entitled to restitution from another because the other, without tortious conduct, has received a benefit, the measure of recovery for the benefit thus received is the value of what was received, limited, if the recipient was not at fault or was no more at fault than the claimant, to its value in advancing the purposes of the recipient,[1] except * * *."
 
 Comment (p. 612):
 
 30
 "a. * * * The rule applies where property has been transferred. * * * as the result of a transaction between the claimant and the person benefited, which transaction has been rescinded because of mistake * * *."
 
 
 31
 "b. Advancing the purpose of the recipient. This phrase has reference to the fact that the value of what is given may not be the same as the value of the benefit received by the recipient considering his purposes."
 
 
 32
 At the beginning of the Restatement of Restitution, sec. 1, e, the following rule is also set forth:
 
 
 33
 "Where benefit and loss do not coincide. There are situations, however, in which a remedy is given under the rules applicable to this subject, where the benefit received by the one is less than the amount of the loss which the other has suffered. In such case, if the transferee was guilty of no fraud, the amount of recovery is usually limited to the amount by which he has been benefited."
 
 
 34
 So far as concerns the hog food which Kostelac continued to receive at the government's request and dumped after he had sold his hogs it is apparent that it had no value to him, the government so admitting in its brief on appeal stating:
 
 
 35
 "Kitchen waste derives its commercial value because of its suitability for hog consumption. Without hogs to feed it to, the Fort Lewis kitchen waste no doubt was valueless to Kostelac."
 
 
 36
 The judgment is reversed, the contract is deemed rescinded and the case remanded to the district court to find the reasonable value of the food fed by Kostelac to his swine at the Gig Harbor Ranch and render judgment to the United States therefor.
 
 
 
 Notes:
 
 
 [1]
 Andrews Bros. Co. v. Youngstown Coke Co., 6 Cir., 86 F. 585, 596; Morton v. Roanoke City Mills, Inc., 4 Cir., 15 F. 2d 545, 547; In re Irving-Austin Bldg. Corp., 7 Cir., 100 F.2d 574, 579; Pittsburgh, C. & St. L. Ry. Co. v. Keokuk & Hamilton Bridge Co., 131 U.S. 371, 389, 9 S.Ct. 770, 33 L.Ed. 157. See also Williston on Contracts, Rev.Ed., Vol. 5, Sec. 1575, pp. 4404-4406