Argued November 21, reversed and remanded December 24, 1957

BROWN ET UX *v.* HASSENSTAB ET UX
319 P. 2d 929

*Bruce W. Williams* argued the cause for appellants. On brief were Williams & Skopil, Salem.

*George Rhoten* argued the cause for respondents. On brief were Rhoten, Rhoten & Speerstra, Salem.

Before PERRY, Chief Justice, and ROSSMAN, BRAND and McALLISTER, Justices.

ROSSMAN, J.

This is an appeal by the plaintiffs, husband and wife, from a decree of the circuit court which dismissed their suit for the rescission of a contract of sale whereby they undertook the purchase from the defendants, husband and wife, of diverse items of property such as a lease upon a building and various articles upon the leased premises that constituted the equipment of a going motion picture theater and the furnishings of eleven apartments in Salem. The challenged decree barred the plaintiffs from claiming any right, title or interest in any of the property. The complaint sought the desired relief upon charges of false representations.

■ July 16, 1952, Joseph Hassenstab, one of the two defendants, listed a motion picture theater, of which he and his wife were the owners, with Stanley Zeeb, a real estate agent. The business name, equipment and the lease of the building which, besides the theater, housed the aforementioned eleven apartments and two stores, were offered for sale. Those items, after the plaintiffs had contracted to purchase them, became the subject matter of this suit. Hassenstab told Zeeb that the business grossed about $4,000 per month and that the expenses, roughly estimated, were about $1,200 per month. Zeeb placed the following advertisement in a newspaper:

> "If you are interested in a good theater that shows about $20,000 per year net income and can be purchased on E. Z. terms, call for appointment."

Mr. and Mrs. Hassenstab had knowledge of the contents of the advertisement. Michael Brown, one of the two plaintiffs, was attracted by the advertisement and called upon Zeeb who told him that from his information the business did about $20,000 per year net,

and that any further information would have to come from Hassenstab. Brown swore that upon being introduced to Hassenstab he asked the latter whether the business really netted $20,000 and that Hassenstab said that it did. Hassenstab testified that he represented the business as netting between $15,000 and $20,000.

Zeeb testified that Hassenstab told Brown that the income included everything but the rentals, and that an additional sum of $6,000 was mentioned. Zeeb said, "I mean it was just that that particular amount was plus whatever had been reported to the buyer." Zeeb then told Brown that, in addition to the $2,000, that had been reported, the Hassenstabs had not taken into consideration payments of $500 per month which they had been making on a mortgage. According to Brown, he asked Hassenstab on two occasions, once on September 24, 1952 before signing the contract, and again in December, 1952 whether the business had netted $26,000 and that Hassenstab replied in the affirmative.

The earnest money receipt provided that "Purchasers to look at books and approve them by August 23, 1952." On the evening of August 22, 1952, the Browns went to the theater to examine the books. Mrs. Hassenstab, who did the bookkeeping, had prepared a typewritten statement of receipts and expenses from her day book, payroll books and rental records. According to her, the statement which she had prepared was a more convenient source of the truth than the set of books. And, indeed, it was. The most important book was the day book. The left-hand page was similar to a cash receipts journal, with individual entries for each day of the year, of the cash received from the sale of candy, popcorn and Coca Cola, the receipts from

the box office, the admissions tax and a total of the box office receipts plus admissions tax. The right-hand page was similar to a cash disbursements journal. There were no subtotals or totals. The books were displayed at that time, but it was the typewritten statement prepared by Mrs. Hassenstab that received attention. The books, lacking as they were in totals and other entries, were of little help to one who sought information.

The statement prepared by Mrs. Hassenstab was a total of the figures just mentioned, or an average monthly total which took into consideration the rentals and the payroll. The statement remained in the possession of the Hassenstabs and has not been produced. Mr. Brown testified that the statement represented the average monthly box office "take" to be $3,700 and the expenses as about $1,200. Mrs. Brown said it represented the box office receipts at $37,000. The Hassenstabs, who had prepared the statement, could not remember any of the figures. Mr. Brown testified: "At that time we had no reason to question it. We accepted it as a true picture of their books." According to him, he "looked at the gross, added up the figures of overhead expenses and subtracted it from the gross and the amount was approximately the same as represented this $26,000."

We will attempt an explanation of the statement which was prepared by Mrs. Hassenstab consistent with the good faith of all the parties. She was asked:

"Q Was the total gross on the Hollywood Theater at any time in the two years prior to October 1, 1952, $48,000.00 on the theater alone, $48,000.00 a year?

"A Our computation was on the year 1951 at the time I gave the figures; in the latter half of $40,000. It was between 45 and 48."

In that year the receipts from the theater were, according to the income tax statement of the Hassenstabs, $41,513.95 (box office, $32,643.93 plus film advertisement, $798 and concessions, $8,072.02). Including rents, the Hassenstabs showed gross receipts of $45,831.95 in their income tax statement for 1951. Mrs. Hassenstab called the amount indicated in the tax schedule the "net gross." "The total gross", she said, "would be in the vicinity of $51,000 or $52,000. The gross includes the admission tax. They call it net gross when they take that in."

If we assume that Mrs. Hassenstab included the amount of the federal admissions tax in her estimate of the gross receipts of the theater, the gross receipts would have been about $47,000. It will be noticed that that figure is consistent with her statement that the gross receipts from the theater were between $45,000 and $48,000. Assuming that was the yearly figure, the monthly average would have been about $3,900. This figure will be noticed to be consistent with Mr. Hassenstab's opinion that the business grossed about $4,000 a month.

Mrs. Hassenstab said that the statement which she prepared for the Browns showed "all running expenses, segregated, and all income, segregated." She declared that "running expenses" were regular expenses necessary to operate a theater "such as utilities, film rentals, advertising, rent, sound service, salaries and film deliveries." Mrs. Hassenstab thought the theater alone had netted about $15,000 in 1951, and explained that she had arrived at that figure by deducting the "running expenses" from the "total income" of the theater for the year 1951.

We have estimated that what Mrs. Hassenstab treated as "running expenses" amounted to about

$29,000 in 1951. If the Browns and the Hassenstabs estimated the net profit by deducting the "running expenses" from the "total gross," they would have arrived at a net profit from the theater of about $18,000. If the estimated rentals are added to this, the net profit from the theater and the rentals would have been shown to be $22,000. This is consistent with Mr. Brown's statement that when he computed what he thought to be the net income from the typewritten statement prepared by Mrs. Hassenstab, it appeared to be about $26,000. The estimated figure was erroneous in that the amusement tax, which amounted to approximately $6,000, and the cost of goods sold, which amounted to about $4,000, were never deducted from the "total gross" which, as computed by Mrs. Hassenstab, included the admissions tax and the receipts from the sale of refreshments. It appears, therefore, that the Browns were led to believe, by the schedule presented to them by the Hassenstabs, that the net income from the theater was $10,000 more than it actually was. We estimate the net income from the theater to have been about $8,000. If the rentals are added to that figure, the net income from the enterprise was $12,000. From that amount the Hassenstabs paid approximately $6,500 on their mortgage debt.

We will next concern ourselves with the facts relating to the plaintiffs' knowledge of the misrepresentations. The contract was signed in September, 1952, and the Browns took possession on October 1, 1952. Mr. Brown testified that in December he asked Mr. Hassenstab if the business had netted $26,000 and received as answer, "yes." Mr. Brown related that he then asked Hassenstab how much amusement tax he had paid and was told, "anywhere from three to four to five hundred dollars." Mr. Brown declared:

"* * * knowing we had paid that much tax and knowing we didn't net that amount, I knew the theater wasn't what it was represented." Later, in his testimony, he explained that he did not have actual knowledge, but that he suspected that the gross return from the theater was not as much as he had been led to believe.

In March Mr. Brown asked Mr. Zeeb to help him gain access to the books which were in the possession of the Hassenstabs. The latter told Zeeb that the Browns were free to see the books. In April, after the Browns had failed to make their monthly payment to the Hassenstabs, Mrs. Brown went to the Hassenstabs and asked for and was shown their income tax statements for 1951 and 1952, which showed a net income of $5,533.76 in 1951 and $229 for 1952. On May 26, 1953, the Browns went to the Hassenstabs and tendered back the keys, the contract, the lease and the retirement of assumed business name. The Hassenstabs did not accept the tender. The Browns vacated the premises the same day and commenced this suit for rescission attaching the items just named to their complaint.

Without resort to further analysis, we express our belief that the representations made by the Hassenstabs were false.

■ We have previously held that a material misrepresentation, although innocently made, may be grounds for rescission. *Schuler v. Humphrey,* 198 Or 458, 257 P2d 865; *Weiss and Hamilton v. Gumbert,* 191 Or 119, 227 P2d 812, 228 P2d 800; *Sharkey v. Burlingame Co.,* 131 Or 185, 282 P 546; 3 Pomeroy, Equity Jurisprudence, 5th Ed, § 888, p 493.

The representations which the Hassenstabs made were in the form of statements of fact. *J. C. Corbin Co. v. Preston,* 109 Or 230, 212 P 541, 218 P 917. It is evident

that they were made with the intent to induce action upon the part of a prospective purchaser. *Larsen v. Lootens,* 102 Or 579, 194 P 699, 203 P 621. The plaintiffs testified that they would not have entered into the contract had they not believed in the truth of defendants' representations. *Johnson v. Cofer,* 204 Or 142, 281 P 2d 981; *Weiss and Hamilton v. Gumbert,* supra; *J. C. Corbin v. Preston,* supra; *Cunningham v. Studio Theatre, Inc.,* 38 Wash2d 417, 229 P2d 890, 27 ALR2d 28; 1 Black, Rescission of Contracts, 2d Ed, § 83, p 226. The record is clear that the plaintiffs relied on the representations made by the defendants.

The evidence of the truth of the representations made by the defendants was in their books which were prepared by one of the defendants. A perusal by the plaintiffs of the books would have revealed nothing significant to them, unless they had created summations of all the daily receipts and disbursements for the year. The defendants, however, provided the plaintiffs with a schedule which purported to represent a summary of their books. The plaintiffs, who had had no experience in the motion picture theatre business, deducted the expenses indicated by the schedule from the gross receipts as reported by the schedule. The resultant figure approximated the representations made by the defendants. We find that under the circumstances the plaintiffs justifiably relied on the representations made by the defendants. *Weiss and Hamilton v. Gumbert,* supra; *J. C. Corbin Co. v. Preston,* supra; *Cunningham v. Studio Theatre, Inc.,* supra; 3 Pomeroy, Equity Jurisprudence, 5th Ed, § 895, p 519; 1 Black, Rescission of Contracts, 2d Ed, § 115, p 356.

■ We must next inquire whether the plaintiffs were reasonably prompt in effecting rescission. In December, although the defendants continued the course

of their misrepresentations, the plaintiffs suspected that the receipts from the box office were not as high as they had been led to believe. In *Cameron v. Edgemont Investment Co.*, 136 Or 385, 299 P 698, we said, in dicta:

"* * * As was pointed out in *Whitney v. Bissell*, 75 Or. 28 (146 P. 141, L.R.A. 1915D, 257), notice of acts and circumstances which would put a man of ordinary prudence and intelligence upon inquiry is equivalent in the eyes of the law to knowledge of all the facts a reasonably diligent inquiry would disclose. * * * It is evident that this rule must be applied with caution."

*Wilson v. Empire Holding Co.*, 145 Or 598, 28 P2d 843; *Housley v. Linnton Plywood Assn.*, 210 Or 520, 311 P2d 432; *Brite v. W. J. Howey Co.*, 81 F2d 840. In *Mesh v. Citrin*, 299 Mich 527, 300 NW 870, the court, quoting from *Barrion v. Myers*, 146 Mich 510, said:

" 'The law does not require action to rescind before the defrauded person is reasonably certain that he has been defrauded. If he acts with reasonable promptness thereafter it is sufficient. The law of laches should be used as a shield and not a sword.' "

In *Hartford Empire Co. v. Glenshaw Glass Co.*, 47 F Supp 711, the court quoted *Emery v. Third National Bank of Pittsburgh*, 308 Pa 504, 162 A 281 (reaffirmed 314 Pa 544, 171 A 881) for the following:

"But a bare suspicion or an opportunity to learn the truth, through the exercise of reasonable diligence does not constitute knowledge of fraud sufficient to prevent recovery."

In the present case, the suspicions of the plaintiffs were lulled by the continued misrepresentations of the defendants as to the amount of their net income. The plaintiffs could not apply the present receipts as a standard because they were informed that during the

holiday season the motion picture theater business was at its lowest. In March they attempted to gain access to the books. In mid-April Mrs. Brown succeeded in seeing the books and the Hassenstabs' income tax returns. We think that the Browns discovered the falsity of the representations in mid-April. We do not believe that they should be detrimentally affected through their omission to have readily imputed a fraudulent intent to the Hassenstabs. *Cunningham v. Studio Theatre, Inc.*, supra; 3 Black, Rescission of Contracts, 2d Ed, § 539, p 1327.

We must next determine whether the Browns embraced rescission of the contract promptly after their discovery of the misrepresentation.

 When one discovers that fraud or misrepresentation induced him to enter into a contract, he has an election either to continue the obligation or to disaffirm it. The two courses of action are inconsistent and the taking of one will preclude the other. The duration of time between discovery of the fraud and the purported disaffirmance is one factor evidencing a prior election to take the one course or the other. The importance of this factor as well as others, such as the continued receipt of benefits under the contract, the performing of obligations under the contract, or, more generally, any act indicating an intention to abide by the contract, will depend upon the facts of the particular case. In general, the would-be plaintiff must make his election with reasonable promptness. Important considerations in determining whether the intended rescission was reasonably prompt are whether or not the contract was of a speculative character, was the subject matter susceptible to extreme and rapid variability in price, was there a possibility of prejudice to the other party as a result of the delay, did actual in-

jury result to the other party because of the delay, and did rights of third parties intervene. *Wilson v. Empire Holding Corp.,* 145 Or 598, 28 P2d 843; *Whitney v. Bissell,* 75 Or 28, 146 P 141; *Scott v. Walton,* 32 Or 460, 52 P 180; *Johns v. McGenty,* 222 Minn 84, 23 NW2d 289; *Blakeley v. Bradley* (Mo), 281 SW2d 835; Restatement of the Law, Contracts, §§ 480-484; note 30 LRS(NS) 872, citing *Wicks v. Smith,* 21 Kan 412, 30 Am Rep 433, quoting *Clough v. London & N. W. R. Co. L.R.,* 7 Exch 26; 9 Am Jur, Cancellation of Instruments, §§ 45-46; 12 CJS, Cancellation of Instruments, § 38, p 996; Black, Rescission of Contracts, 2d Ed, § 536, p 1321; Pomeroy, Equity Jurisprudence, 5th Ed, §§ 419, 419c, 916, 917; Williston on Contracts, Rev Ed, § 685, p 1974, § 1520, p 4274.

The facts of this case do not sufficiently indicate that the plaintiffs elected to affirm the contract. Nor can we say that the election to rescind announced in May of 1953, following discovery of the misrepresentation in mid-April, 1953, was not reasonably prompt. *Reeves v. Dickenson,* 208 Or 360, 300 P2d 458; *Cunningham v. Studio Theatre, Inc.,* supra.

One other objection to the granting of a rescission in this case remains for consideration. The plaintiffs in their complaint did not explicitly offer to recompense the defendants for the period in which the plaintiffs occupied the theater. The trial court made the following statement at the opening of the trial:

> "In the event it should be found that the plaintiffs should prevail on the question of rescission, it will be necessary probably to have a further hearing on the question of an accounting. However, I think at this time you should limit the hearing to the question of the right to rescind. I will hear evidence on that phase of the case."

Neither party manifested any objection to the course which the court proposed to take. The defendants raised no objection to the complaint by demurrer or otherwise. We do not believe that they can make that objection now. An equity court has the power to shape its decree so that one who seeks equity may be compelled to do equity. 3 Pomeroy, Equity Jurisprudence, 5th Ed, § 910, pp 574 and 578. In *Schuler v. Humphrey*, supra, the pleadings do not reveal an explicit offer to recompense the defendants for the net income received by the plaintiff while he was in possession, yet relief by rescission was ordered.

Decree reversed and remanded.